## VON EBERSTEIN v. CHAMBLISS.

(Circuit Court, S. D. Georgia, E. D. December 23, 1908.)

PATENTS (§ 328*)—NOVELTY—PILE DRIVER.

The Von Eberstein patent No. 726,268, for improvements in pile drivers, which consist of mechanism by which a free movement is given to the leads or ways by reason of which piles may be driven within a considerable radius without moving the frame of the machine, and also either perpendicularly or obliquely, is void for lack of novelty, the essential features covered by the general language of the claims having been in prior use. If conceded validity, the patent *held* not infringed by the machine of defendant shown to have been in use prior to the date of the application for the patent. The relative mechanical features and improvements in pile driving machines discussed.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

In Equity. Suit for infringement of letters patent No. 726,268, for a pile driver, issued to Frederick A. Von Eberstein April 28, 1903. On final hearing.

A. L. Alexander and Walter G. Charlton, for complainant.
William L. Clay, for defendant.

SPEER, District Judge. Frederick A. Von Eberstein brings his bill in equity to enjoin J. R. Chambliss from alleged infringements of patent rights granted to the complainant in "certain new and useful improvements in pile drivers." On November 18, 1902, an application for the patent in question was filed in Washington with the Commissioner of Patents, and letters patent in due course were issued. Refer-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ence to the specification and claims made in the letters patent discloses the alleged novel features, which are claimed by Von Eberstein and which are essential to the validity of his patent. The language of the specification is as follows:

"This invention relates to machines for driving piles, being particularly adapted for use in the construction of railroads in low, marshy, and soft land, the construction obviating the necessity of shifting the machine laterally to drive the usual number of piles transversely of the road, and at the same time admitting of the center piles being driven perpendicularly and the end piles oppositely inclined, so as to mutually brace each other when the header is in place and secured thereto. The machine will also admit of driving piles perpendicularly, whether going up or down grade. In accordance with this invention the guides may be moved laterally or swung from side to side or forward and rearward, according as the pile is to be driven vertically or inclined to meet any requirement."

The bill sets forth that since the issuance of letters patent the complainant has been the sole owner of his improved pile drivers. Of these he claims to have used and sold a number, and to have the sole rights therein. The defendant, notwithstanding, is alleged to have proceeded to use and—

"is now engaged in using pile drivers containing and embracing the invention described and patented, and the sole and intended use of which is to practice the process described and patented in and by the said letters patent, * * * and the claims thereof, * * * is now infringing upon the exclusive rights secured to your orator by said claims, * * * and is preparing to erect and use and will shortly have in operation other pile drivers, which will likewise infringe upon and cause additional damage to your orator."

Asserting that irreparable damage will result from the threatened continued use of the said pile drivers, the complainant prays provisional and permanent injunctions against the defendant and his agents from using or selling the machines or invention patented, and further seeks an accounting for all profits and damages resulting from the alleged unlawful use and practice of the invention. Rule nisi was granted upon these prayers, and a bond of $5,000 was required of the defendant as a condition for the withholding of the injunction. Upon the filing of answers and amendments by the defendant, the cause proceeded regularly before an examiner, and voluminous testimony was taken. Much of this is descriptive of the intricate mechanical parts of all types of pile drivers now extant. The court has been assisted by the able arguments and elaborate briefs of counsel in reaching an understanding and conclusion upon the mass of expert evidence offered by both sides.

The answer of the defendant makes denial (1) that Von Eberstein is the original and first inventor of the contrivance before the court; and (2) that it was a new and useful invention not known or used by others, or in public use in the United States for more than two years. In this connection he claims that the driver which is the subject of complaint has been used by him since 1899, and, with the exception of certain minor changes, has been so used for more than 15 years. He further states the times, places, and purposes of various other pile-driving machines containing Von Eberstein's devices, which were in use for more than two years before application for patent was made.

Having described the invention, the three claims of novelty which are made by the patentee, and upon which the validity and extent of his rights are based, are stated in the following language:

"(1) In a pile driver, a derrick provided at its upper end with a transverse track, a trolley wheel mounted upon said track and adapted to travel and to rock thereon, guides connected at their upper end with said trolley wheel and movable therewith and having an independent sidewise swinging movement, and means for securing the guides in an adjusted position, substantially as described.

"(2) In a pile driver and in combination with the derrick provided with a track, and guides, a single trolley wheel for supporting the guides upon the track, a frame connected to the upper portion of the guides and spaced therefrom, and a pin for the trolley wheel supported at its ends by said frame, and a crosspiece connecting said guides, substantially as described.

"(3) In a pile driver, the combination of the following parts, namely: A sled, a derrick mounted upon the sled, a transverse track at the upper end of the derrick, uprights between the derrick and sled, braces between the derrick and uprights, guides, a single trolley wheel at the upper end of the guides and mounted upon the track, means for shifting the guides along the track and fixing them in an adjusted position, said guides being free to swing laterally, forward, and rearward at their lower end, and means for securing the guides at their lower end in an adjusted position, substantially as set forth."

The machines, which Chambliss in his defense contends he has had in public use and operation since 1888, are of two slightly differing classes. From the photographs and evidence before the court it is apparent that the defendant's present driver is a considerable improvement on his earlier models, and upon superficial examination presents but little variation from the essential features of Von Eberstein. These the defendant claims he devised as early as 1899.

The superiority of the complainant's patent, as described by one of the witnesses, lies chiefly in the "flexibility" of the leads, ways, or guides—as they are variously termed—which direct the movement of the hammer from the top of the derrick to the pile which is being driven below. The ordinary driver possesses no such advantages. It is necessary to move the entire derrick and guides, mounted as they are upon beams which are called a "sled," in order to drive the piles forward, backward, or transversely. There is no independent motion whatever of the guides fastened to the derrick. Von Eberstein, by the use of a transverse beam at the top of the derrick, a frame connecting the top of the guides carrying a grooved trolley wheel held by a pin, a rounded iron track on the top of the beam over which the wheel passes, and a pulley at each end of the beam within which ropes descend from each side of the top of the guides, is able to change the location of his driver at will. The guides, moving along the track on the transverse beam, permit the hammer to drive a pile at any point parallel to the beam beneath. The trolley wheel mounted upon the rounded track, and acting as a pivot for the guide frame, also permits the guides to be hung either perpendicularly to the ground, or obliquely to right or left, and in the same way to be drawn forward or rearward of the original point of operation. This, it was testified, has given great freedom to the machine in its range of action, and, without any movement of the stationary derrick, piles may be driven at

166 F.—30

any point within almost an entire circle, and may be forced into the ground either perpendicularly or obliquely at any of these points. Much practical value has been derived from its use in trestle and bridge construction, which necessitates the driving of two perpendicular piles, and then upon each side of these what are termed "batters" as braces. The Von Eberstein patent, also, by its system of bracing, accomplished by running guy ropes back of the engine, admitted of a reach superior to older machines, and no risk was taken of breaking the sled in its middle or forward parts, a catastrophe which had been a great disadvantage to those archaic types. Work could be done more economically and quickly, since the derrick itself did not often have to be moved forward, and neither the derrick nor the guides required blocks, canting, or leverage whenever oblique timbers were desired.

The first design, which the defendant claims to have operated and which is referred to in the evidence as Chambliss' "old sash frame pile driver," or "square rig pile driver," or "gallow driver," consisted of a square upright frame erected at one end of a sled, with a crossbeam on top of the frame from which the guides for the hammer were suspended. It seems from photographs and other evidence that the framework for the guides was largely beneath the crossbeam at the top of the derrick. It was also testified that this style of driver had long been in use. As to the methods, however, for moving the guides, there is some difference in the testimony. The evidence of the complainant was mainly of a negative character, the witnesses declaring that Von Eberstein's patent comprised entirely novel features, which they had never before seen on any machine. They described with some enthusiasm their value in economy of time and labor. But they were somewhat nebulous with regard to the lateral motion of the guides on the old sash frame drivers, which most of them admitted were in existence. Some stated that by the use of grease on the crossbeam and leverage upon the guides some measure of lateral motion could be transmitted; others said that two wheels were used to move along the crossbeam; and still others admitted that a single wheel had been previously used. Chambliss himself testified that the roller from which the leads or guides were suspended on his old machine was a single round roller, rolling from one side to the other on a flat rail affixed to the beam, and that he had used similar machines in constructing various railroads, from 1889 until 1899 (when his present driver was devised), in Georgia, Alabama, Florida, and Tennessee. While the photographs of the "old sash frame machine" used by Chambliss on Hutchinson Island in 1899 and 1900, introduced by the complainant, and of a similar driver by the defendant, seem to indicate that only a small portion of the two leads extended above the crossbeam, and there is no sign of any roller or rollers underneath or between the leads to give them motion, yet the two pulleys used in the latest device of Chambliss, now complained of, for drawing the leads laterally across the beam, are clearly apparent. Possibly the machine was of the class described by one of the witnesses, in which by the use of leverage and a lubricant, or of segmental blocks affording a partly rolling motion, the position of the guides could be changed. But

whether the machine was of this crude type or a more improved mechanism, the testimony is overwhelming that Chambliss did operate a driver with some method of lateral motion for the guides, and that contemporaneously with his there were like machines, having transverse beams, flat surface tracks thereon, and two—and even one—wheel or roller at the top of the guides to move across the track. These all existed before Von Eberstein completed his device to its finally patented condition. The determination of the validity and effectiveness of the patent must then rest upon a careful study and comparison of the progress in the manufacture of pile drivers when Chambliss built his machines—or, as is termed, "the prior state of the art"—and of the improvements contained in Von Eberstein's mechanism.

Now, the section of the Revised Statutes apposite to this subject provides that, with certain stated conditions—

"any person who has invented or discovered any new and useful art, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor." Section 3886, Rev. St.

The courts in their construction of this section have uniformly held that three elements are essential to constitute a valid and effective patent, viz.: (1) Creation, by the exercise not merely of mechanical skill, but of the inventive faculties, or, in the language of Mr. Justice Matthews, "that intuitive faculty of the mind, put forth in search for new results or new methods, creating what had not before existed, or bringing to light what lay hidden from vision" (Hollister v. Benedict Manufacturing Co., 113 U. S. 72, 5 Sup. Ct. 717, 28 L. Ed. 901); (2) the result must be so distinct an advance in the prior art, machine, or process as to have the feature of novelty, accomplishing by a new method, through the substitution or addition of a new whole, a new part or parts, or through the combination of old parts in a new way, a similar effect in a new and different way; and (3) the thing or process must be of utility—that is to say, practicable and capable of performing its specified functions to produce an advantageous or useful result.

The differences between the machine of the complainant and that of the defendant may be briefly described as follows: (1) Von Eberstein's trolley wheel, from which the guides or leads for the hammer are suspended, is grooved, while Chambliss' trolley wheel has a flat surface; (2) the iron track, on which Von Eberstein's trolley wheel moves, is rounded so as to fit into the concave surface of the wheel, while in Chambliss' machine this iron track is flat, an advantage claimed for his device by the complainant because freer and safer forward and rearward play of the guides is permitted; (3) in Von Eberstein's machine, the framework connecting the upper portion of the guides and supporting the trolley wheel is essentially different from the corresponding frame in the Chambliss driver, the guides in the former depending for support upon the trolley wheel being mounted as on a pivot, and in the latter the framework at the top of the guides which inclose the roller being in the shape of a letter V or U, and overhanging the entire crossbeam, thus, the defendant claims, rendering it more

difficult for the roller to leave the track, causing the guides and hammer to become disengaged from the structure and fall to the earth; (4) in Von Eberstein's driver, the motion of the guides upon the track is effected by means of ropes drawn over direction pulleys or wheels on the ends of the crossbeam, while in Chambliss' driver the result is obtained by less artistic, if not less effective, methods through pulleys fastened to the inside corners at the meeting points of the crossbeam and gallows frame, and direction ropes passing through and attached on each side of the guides below the crossbeam, the ropes in Von Eberstein's machine passing above and down the top and sides of the crossbeam and derrick; (5) the methods of fastening the guides at the base of the structure vary—in Von Eberstein's driver, the lower ends being connected by a circular metallic strip, which does not project below the upper surface of the crescent-shaped timber or blocks, fixed upon the ground and termed a "moon-beam," but is fastened thereto by a pin passing through the top of the circular iron strip, changes in the desired angle of the guides for driving various piles being accomplished by the use of wedges on either side of the pin and between the upper surface of the "moon-beam" and the lower face of the circular metallic strip connecting the leads; in Chambliss' machine, on the other hand, the guides projecting below the upper face of the "moon-beam," and being fastened by an entirely different device to the front face or side of the "moon-beam."

The defendant first attacks the validity of the complainant's patent upon the grounds of want of invention and novelty, and prior public use. The statutes relating to patents have prescribed that not only shall the improvement be the fruit of an exercise of inventive faculties and be a novelty, but it must not have been in public use for more than two years prior to the application for a patent. Upon proof that either of these elements is lacking, the patent should be declared void, and an injunction against alleged infringement be denied. Rev. St. §§ 4886, 4887, 4920 (U. S. Comp. St. 1901, pp. 3382, 3394); Andrews v. Hovey, 123 U. S. 267, 8 Sup. Ct. 101, 31 L. Ed. 160. "Inventions," says Mr. Walker in his treatise on "Patents," "like animals, are divisible into classes, and their classes are divisible into orders, and their orders are divisible into genera, and their genera are divisible into species, and their species are divisible into varieties." Walker on Patents, p. 164. They have also been divided into "primary" and "secondary" inventions. The principles applicable to each division in questions of infringement differ materially. A "primary invention" has been defined as "one which performs a function never performed by any earlier invention; while a secondary invention is one which performs a function previously performed by some earlier invention, but in a substantially different way from any that preceded it." Walker on Patents, 313. The Supreme Court of the United States, in Morley Machine Co. v. Lancaster, 129 U. S. 273, 9 Sup. Ct. 302, 32 L. Ed. 715, has defined the legal distinctions flowing from this diversity, as follows:

"Where an invention is one of a primary character, and the mechanical functions performed by the machine are, as a whole, entirely new, all subsequent machines which employ substantially the same means to accomplish

the same result are infringements, although the subsequent machine may contain improvements in the separate mechanisms which go to make up the machine."

The court further held that secondary patents should receive a construction narrower than that given to primary patents. If it be true, then, that this principle obtains where an alleged infringing machine is to be compared in its features with those of a patented machine, the converse is also true, and, where the validity of a patent is attacked for want of novelty and invention, it must be subjected to the same test expressed by the Supreme Court, in a comparison with all earlier machines which represent the "prior art" or manufacture.

It is claimed here that Von Eberstein's driver contained no principles which had not already been known and had long been utilized, and that his improvements represent no more than his superior mechanical skill in their construction. From a careful examination of the record, there is shown beyond peradventure of doubt a prior use of many types of pile drivers. These may be classified as follows: (1) The old style stationary machine, in which the guides were immovable, and which had to be pushed forward or backward to drive a new pile at any new point upon a vertical line, having little or no facilities for driving oblique or batter piles, and no transverse motion of the guides for driving at different points on a horizontal line; (2) a pendulum or "A" pile driver, consisting of an upright frame like the letter A, from the top of which the guides were hung, with an adjustment at their base to hold them perpendicularly or to one side or the other, by means of which both perpendicular and slanting or batter piles could be driven as desired, the guides, however, having no transverse or independent forward and rearward motion; (3) a driver with primitive facilities for a transverse movement of the guides by swinging the forward part of the sled; (4) the old sash frame or square rig driver (Chambliss' earliest machine), with a crossbeam at the top of the derrick, and a limited movement of the guides along this beam by sliding them, the guides being fastened permanently to a block or blocks, and the bottom part of the block being in the form of an arc or segment of a circle, to act as a rocker in swinging the guides to the right or left; (5) a sash frame driver with a transverse beam, and the guides being moved along the top of the beam by a wheel or wheels. An examination of the improvements previously made in the latter class of drivers will determine the patentability of Von Eberstein's devices.

Many of the defendant's witnesses, and some of the complainant's upon cross-examination, testified that great advances had been made in the crossbeam and wheel arrangement for the transverse movement of the guides before Von Eberstein procured his patent. Some said that the guides had been attached to two wheels; others spoke of a single wheel. The weight of the evidence, however, supports Chambliss' contention that the wheel and track device was not original with Von Eberstein, although with the latter it may have reached a greater artistic and mechanical perfection. Leads supported by a single roller with a flat periphery, moving directly on the beam or on a flat track, had been in public use in railroad and bridge construction in as

many as four Southern states besides Georgia from the year 1888 continuously to 1897. E. C. Price testified as to a number of wheel or roller arrangements he had seen operated since 1897. In that year he was working for the Pracket Bridge Company in Macon, and said that he saw a gallows frame pile driver there in use, on which the leads were suspended from the top by a bar of railroad iron and a grooved wheel, that this wheel was grooved to keep it from slipping from the rail, and that the grooved part rolled on the bar of iron. C. E. Rousseau testified that in 1895 he used on the Nacoochee river a machine on which the leads could work from one side to the other by a grooved wheel and a railroad rail as a track, and that the leads had a range transversely of 16 feet. He further stated that he had seen as early as 1891 in Knoxville, Tenn., a machine like that which Chambliss claims he made in 1889; that on this driver the leads were suspended from a crossbeam by a single roller with two "stirrups," one on each end of the rail, extending downward from the crossbeam to the leads. T. P. Kilgo and J. O. Ferguson testified to the use of a single grooved roller moving upon a track during the years 1899 and 1900. Several of the complainant's witnesses upon cross-examination added cumulative evidence to these statements. With regard to this feature, the evidence of F. A. D. Hancock, Von Eberstein's partner from the year 1897 to March, 1899, is very important in its bearing upon the origin of the features in complainant's machine. He said that in taking an inventory of material, a few months after the partnership began, they found some old gear belonging to an abandoned pile driver. His language was that they "found a grooved wheel, Mr. Von Eberstein said was a device used in connection with the sash driver," and "out of this scrap iron grew this thing that has been patented." He denied, however, that the wheel had previously afforded lateral motion. The partners used this wheel upon work between Meldrim and Savannah, and it was run upon a bar or round track. Even then the witness denied that the leads had any lateral motion, although it is difficult to perceive for what other purpose the wheel and track could have been used. He said that they used the regular sash frame driver. Von Eberstein himself testified that this first use was only "experimental," although he admitted driving piles approaching the Savannah river as early as 1900, and that the grooved wheel ran upon a piece of railroad iron. An even earlier use of the essential features of the machine, patented in 1903, is indicated by his partner Hancock's testimony. The effect of the entire testimony relating to the history of Chambliss' drivers shows very clearly that even as early as 1889 he had some sort of roller device for laterally changing the position of the guides, and that in 1899, three years before Von Eberstein's application for letters patent, Chambliss had a similar wheel and track arrangement.

The complainant also claims as novel other features. These are (1) the method of bracing the derrick by ropes from the top of the derrick to the back of the sled; (2) the method of running the rope attached to the hammer from the top of the hammer back to the engine located at the rear of the sled; and (3) the method of attaching the leads or guides to the moon-beam at the foot of the derrick. With regard to the first and second of these characteristics of his machine, it will

suffice to say that the claims of Von Eberstein, which are regarded as the legal basis for any suit or action for infringement, and which are incorporated into the letters patent, make no reference whatever to these particular devices. Moreover, T. W. Whisnant, one of complainant's witnesses, testified that he had seen each of the features on pile-driving machines for 10 years or more previous to this suit. The third alleged improvement seems to possess a greater degree of originality in the use of the blocks and pins for fastening the leads. As to the novelty of the general idea, however, W. F. Chambliss testified that a machine which he had seen in 1899—

"was constructed at the bottom just the same as this; had the same identical construction at the bottom. If a pile was projecting up here into the leads and we did not want to saw that pile, we could take out these two pins right on the moon-beam, and take them out and swing them around, swinging your leads at the top. But with this type of machine (indicating Chambliss' new model) it cannot be done."

C. E. Rousseau testified that he used a similar crescent-shaped moon-beam in 1893. By this the leads could be secured, and moved clear of the old pile projecting into the leads, by swinging them back toward the engine. J. N. Hartsfield testified that in the spring of 1900, at Quitman, Ga., he saw a machine with the leads fastened by an iron apron built in a circle, and secured by pins to the top of a moon-beam, and that he saw a similar device as early as 1893. Other witnesses, Miller, Hammond, and Chambliss himself, testify to the same effect.

From an examination of the models and photographs and the descriptions of the witnesses, it seems established that the only important difference between Von Eberstein's driver and those in previous use, except possibly a mechanical improvement in the method of fastening the leads to the moon-beam by using adjustable blocks, lies in the framework at the top of the leads or guides connecting them and containing the trolley wheel, and in the transverse track. This frame is so constructed in a V shape, a pin passing through the apex of the V and a crosspiece attached to the guides, that the weight of the leads and hammer rests chiefly upon the wheel and the top of the beam or transverse track. This wheel, it is observable, acting as a pivot, drives perpendicular or batter piles in different positions with greater facility, and is a great improvement in construction over the archaic "A" pendulum drivers, once used for that purpose. Whether these results are accomplished with equal effectiveness by the square-rig drivers typified by Chambliss' machine is not shown by the evidence. It does appear, however, that they are capable of doing the same work satisfactorily. In Chambliss' driver, the manner in which the roller is attached to the hammer leads is different. Chambliss' roller being incased in iron extending over and above the crossbeam across to the structure of the derrick. This, it is claimed, is safer than Von Eberstein's device in preventing the leads from jumping or falling off the track. A second feature of the Von Eberstein patent should also be noticed. This is the rounded track, which the complainant contends gives to the guides a freer forward and backward play because the grooved wheel slips more easily over the top of the track. Chambliss' model possesses neither this nor a third characteristic—the method

of drawing the guide ropes over direction pulleys at the ends of the crossbeam, the ropes being drawn over the top of the crossbeam down the sides of the supporting timbers. Chambliss moves his guides to right or left by pulleys attached to the corners beneath where the crossbeam is attached on each end to the derrick, and the ropes are fastened to the guides below the crossbeam. Which of these methods is the more advantageous is not shown. These three features—the framework supporting the trolley wheel, the rounded track, and the pulley attachments—seem to be the only material advances shown in the complainant's driver over the "prior art." Whether they may be regarded as the products of invention it is not necessary to determine here. See Atlantic Works v. Brady, 107 U. S. 199, 2 Sup. Ct. 225, 27 L. Ed. 438; Walker on Patents, 20.

The language of Von Eberstein's three claims contained in the letters patent granted to him attempts to cover broadly all the generic features alleged to be new in connection with the motion of the guides, transversely, sidewise, forwardly, and rearwardly, by means of a trolley wheel upon a track. But the advantages which he might have appropriately claimed, viz., the effective pivotal construction of the frame containing the trolley wheel at the top of the guides, the facility of forward and rearward motion of the guides accomplished by the rounded track, and the passing of the direction ropes over pulleys across the ends of the transverse beam, are omitted. While claim No. 1 purposes to cover "a trolley wheel mounted upon said track and adapted to travel and rock thereon," there seems to be no specific claim for the particular method of the "rocking," viz., upon a rounded track, which would give the complainant any rights against infringers who might construct a track so shaped in connection with a different derrick and leads. If the adjustable blocks for fastening the leads by the moon-beam constitute a patentable feature, it is not sufficiently covered by the general words, "means for attaching the guides in an adjusted position." As to the use of direction pulleys on the ends of the crossbeam, there is no claim whatever. The language of claim No. 2 is also too general to be effective. Claim No. 3 is designed to protect the peculiar combination of parts made by the patentee. This claim, however, does not cover the probably novel features we have mentioned, and is merely a general description of parts and functions described by the witnesses as in previous use by Chambliss and others. With regard to such parts and functions, Von Eberstein cannot properly claim novelty, or that they had not been in public use for more than two years before his application. All the essential features complained of were in existence upon the machine built by Chambliss as early as 1899, or nearly four years before letters patent issued to the complainant.

Under the evidence, Von Eberstein's contentions are driven, as it were, between Scylla and Charybdis. If it is claimed that his machine is so distinct an advance in the prior art as to be patentable, since Chambliss' machine with its parts and their combination was previously in existence and typified only the general progress of pile-driving manufacture, the very claim of patentability must defeat the claim of infringement. If, on the other hand, the alternative proposition is

offered that the Chambliss machine's parts and their combination are so identical with complainant's driver as to constitute an infringement of his patent, the fact that all these essential parts and combinations are shown by the evidence to have been previously used by Chambliss and others must nullify as to all of those features the effectiveness of the patent. In either event, the complainant's contentions must fail, and the injunction and other relief prayed will be denied.