# HOLLISTER, Collector, *v.* BENEDICT & BURNHAM MANUFACTURING COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF CONNECTICUT.

Argued November 11, 12, 1884.—Decided January 5, 1885.

Novelty and increased utility in an improvement upon previous devices do not necessarily make it an invention.

A device which displays only the expected skill of the maker's calling, and involves only the exercise of ordinary faculties of reasoning upon materials supplied by special knowledge and facility of manipulation resulting from habitual intelligent practice, is in no sense a creative work of inventive

faculty, such as the Constitution and the patent laws aim to encourage and
reward.

The third claim in the specification and claims of the patent issued to Edward
A. Locke, August 3, 1869, for an improvement in revenue stamps, although
new and useful, is not such an improvement upon the devices previously in
use, as entitles it to be regarded as an invention.

While it would seem clear that a suit may be maintained in the Court of
Claims against the United States to recover for the use of a patented in-
vention by an officer of the government for its benefit, if the right of the
patentee is acknowledged; *Semble*, that it may even be maintained when
the exclusive right of the patentee is contested.

This was a bill in equity brought by the assignees of a patent
granted to Edward A. Locke, August 3, 1869, for an "im-
provement of a revenue stamp for barrels, and identifying
marks, stamps, or labels, for revenue purposes," against a col-
lector of internal revenue. The bill alleged infringements by
the defendant, and prayed for a temporary injunction, a per-
petual injunction, an accounting, and damages. The answer
set up the official position of the defendant in the use of the
stamps alleged to be infringements; denied that he had in-
fringed; denied that the alleged invention was new or useful,
or that it was patentable; and averred that so much of it as re-
lated to the cancellation, affixing, and removal of stamps, and
identification of packages was not patentable.

The court below sustained the patent, and found that the
defendant had infringed it, and decreed a perpetual injunction,
and an accounting, and the payment of what might be found
due as profits. From this decree the collector appealed.

*Mr. Assistant Attorney-General Maury* for appellant.

*Mr. S. W. Kellogg* and *Mr. John S. Beach* for appellee.

Mr. Justice MATTHEWS delivered the opinion of the court.

This is a bill in equity to enjoin the alleged infringement of
letters patent No. 93, 391, issued to Edward A. Locke for certain
improvements in identifying revenue marks or labels, dated
August 3, 1869, the appellees being assignees of the patentee,

and the appellant, the collector of internal revenue for the Second Collection District of Connecticut.

The specification and claims, with the accompanying drawings, are as follows:

*Fig. 1.*

*Fig. 2.*

*Fig. 3.*

" This invention is designed more especially for use in sealing liquor casks with identifying marks or labels for revenue purposes, and in such a manner that while truly designating the contents of the cask, or giving such other indication as may be demanded, they cannot be fraudulently removed.

" Fig. 1 represents a printed paper revenue stamp, the circular portion at the right hand being the stamp proper, which is applied to the cask or box, and the portion at the left hand being the 'stub,' or that portion retained by the government official.

Fig. 2 represents a separate strip, which is shown in Fig. 1 as attached at its left end to the stub of the paper stamp proper, in such manner that its coupons may be readily cut off and permanently affixed to the stamp proper when the latter is secured to the cask. Fig. 3 represents a metallic piece or strip, shown as detached, and before being applied to the stamp.

"The main body of the sheet of paper being printed substantially as shown, so as to designate by a letter of the alphabet, or otherwise, the appropriate series, and with blanks for the particular number of each series, and also with a number indicating numbers of gallons, &c., in tens, has also a series of numbers, from one to nine, inclusive, any one of which may be punched out by the proper official, in accordance with the actual number of gallons contained in the vessel. Thus, if 126 be the proper number of gallons, and 120 be the whole number printed upon the particular stamp, the officer, in order to indicate 126, would punch through the digital number 6, both upon the circular stamp, and upon its 'stub' or counter-check.

" The piece shown in Fig. 3 I prefer to make of thin metal, because more readily embossed or impressed with permanent or ineffaceable characters, and because less destructible in handling and transmission; after it shall have been torn away from the stamp. This piece (also shown in part in Fig. 1) may be conveniently made of oblong, or any appropriate form, its conditions being merely, so far as concerns its shape, that it be of sufficient size to extend beyond the opening made in the paper for the exposure of the letters and figures made on it, and be capable of being retained in its place between the paper and another backing-piece of paper, the two pieces of paper being gummed together for this purpose. This backing-piece I prepare with dried gum on its outer face, that the stamp may be always ready by merely moistening the gum for instant application to the cask.

" The strip shown in Fig. 2 I secure in part to the left side of the paper, by gumming its remaining portion, upon which are coupons for the units, being dry-gummed on its under side, so that when the proper number of gallons has been deter-

mined, the officer, upon cutting off the coupons at the figure designating the unit or digital number required, may, by moistening it, instantly, and without cutting or injuring the stamp, apply it to the stamp, while the stub or remaining portion of the slip will correspondingly indicate thereon just what has been so detached and applied to the stamp. Thus, to indicate 126 gallons, 120 being the whole number of the stamp, the coupon slip is cut off between the numbers 6 and 7, and the piece so cut off is moistened on the back and permanently attached to the face of the stamp, the 6 being the significant figure of the coupon.

" The mode of applying a stamp so made to a cask may be, by way of greater protection against liability to damage or accident, as shown and described in my patent No. 58,847—that is, by boring a shallow depression in the wood of the cask or case, and after affixing the stamp by its gum to the bottom of this depression, then placing over it a ring having downturned edges, and, by pressing the same, forcing its outer edge into the wood. Or the wood may have an annular groove cut therein to receive the edge of the ring when so forced home.

" Instead of making the removable piece out of metal, or of making it in a piece separate from the stamp, it may be made of the same piece of paper of which the stamp is composed, by simply having its outline perforated after the manner of postage stamps, but ungummed at its back, so as readily to be torn away and detached from the stamp.

" Although I have shown and described a lining-paper, between which and the stamp or surface-paper the metal slip is held, yet I may dispense with such lining and employ a thicker paper for the stamp, the metal strip in such cases, if preferred, being confined or held to it by having its ends pass through slits made in the paper for such purpose. Or the metal piece may have points or projections at its ends or corners, or elsewhere, which may be forced or passed through the paper and clinched on the under side.

" For the purpose of readily separating the circular stamp from the sheet, I perforate it about its periphery with any

suitable slits, cuts, or openings adapted to the thickness or texture of the paper. I also prefer to have the stamps prepared with blanks and dotted lines, on which the collector, gauger, and storekeeper may place their signatures, as shown in Fig. 1.

"It is to be understood that the metallic or other slip, the stub or check part of the stamp paper, and also the stub of the coupon piece, are all to be consecutively numbered alike for each alphabetical series, the capital letter A in the drawings indicating the alphabetical series, and the number immediately to the right thereof indicating a number in the consecutive numbers of such series.

"For convenience I prefer to have the stamps, after being printed, bound up in book form, after the manner of merchants' or bankers' check books, so that each stamp, as cut out, shall leave in the book its corresponding marginal piece or stub, having thereon a record of letters, figures, marks, &c., according with those upon such stamps.

"I claim—

"1. A stamp, the body of which is made of paper or other suitable material, and having a removable slip of metal or other material, displaying thereon a serial number or other specific identifying mark corresponding with a similar mark upon the stub, and so attached that the removal of such slip must mutilate or destroy the stamp.

"2. In a paper revenue stamp for indicating the contents of a cask, and having thereon a number designating the number of gallons or other measure, providing the stamp, and also its stub or check-piece, with corresponding digital numbers, to be punched out to indicate the units, substantially as described.

"3. In combination with a paper stamp having a check-piece or stub, from which it is detached when applied for use, a coupon slip, whose coupons are to be secured to the face of the stamps, as and for the purpose described."

The following is a copy of the face of the tax-paid internal revenue stamp used by the appellant and claimed to be an infringement of the patent:

Opinion of the Court.

## COPY OF HOLLISTER REVENUE STAMP.

*Removable part is indicated by lines.*

As described by the complainant's witnesses, this stamp "is composed of a single thickness of paper, on the face of which the number and registering marks are conveniently placed. On the back of this stamp is a piece of paper somewhat wider

than the surface on which the number and registering marks are printed. The two edges of this back-piece are caused to adhere to the back of the stamp, one above and the other below that portion of the surface which indicates the number, contents, etc. The back of the stamp, between the two edges of this strip or back-piece, is free and loose. The object of this is that when the back of the stamp is coated with adhesive material and attached to the barrel, that portion of the surface of the stamp which is covered by the strip or back-piece will not adhere to the barrel, hence, after the stamp is secured to the barrel that portion of the stamp on which are the registering marks may be removed, and preserve the marks and figures thereon, the removal of that part defacing the stamp as well as preserving the record, and this can be done because that portion of the stamp which is removed is prevented from adhering to the barrel. To remove this portion it is only necessary to separate that portion from the body at its two edges."

This is marked in the record as Complainant's Exhibit Hollister Revenue Stamp.

The present controversy relates to the first claim of the Locke patent, in respect to which alone the decree appealed from established an infringement. It is as follows:

"A stamp, the body of which is made of paper or other material, and having a removable slip of metal or other material, displaying thereon a serial number or other specific identifying mark corresponding with a similar mark upon the stub, and so attached that the removal of such slip must mutilate or destroy the stamp."

One of the defences relied on by the appellant is thus stated in the answer, and, in matter of fact, is by stipulation admitted to be true:

"First. That any and all acts complained of in said bill by the said petitioner as done by the respondent were done and performed by him in the discharge of his duties as collector of internal revenue for the United States for a designated collection district of the State of Connecticut, and by direction of the Commissioner of Internal Revenue, an officer of the Treasury Department of the United States; that any revenue stamps by

him used have been furnished by the Bureau of Internal Revenue, of which said Commissioner is the official head, for use in the discharge of said duties as collector, and the same have been used solely as a means of collecting the taxes due to the United States, which said taxes have been imposed by the laws of the United States, and the manner of said collection, as followed by said collector, regulated and authorized by such laws; that said respondent has acted as such collector by virtue of legal appointments thereto by the President of the United States, duly confirmed by the Senate of the United States, for and during all the times mentioned in said bill of complaint."

It was authoritatively declared in *James* v. *Campbell*, 104 U. S. 356, that the right of the patentee, under letters patent for an invention granted by the United States, was exclusive of the government of the United States as well as of all others, and stood on the footing of all other property, the right to which was secured, as against the government, by the constitutional guaranty which prohibits the taking of private property for public use without compensation; but doubts were expressed whether a suit could be sustained, such as the present, against public officers, or whether a suit upon an implied promise of indemnity might not be prosecuted against the United States by name in the Court of Claims. If the right of the patentee was acknowledged, and, without his consent, an officer of the government, acting under legislative authority, made use of the invention in the discharge of his official duties, it would seem to be a clear case of the exercise of the right of eminent domain, upon which the law would imply a promise of compensation, an action on which would lie, within the jurisdiction of the Court of Claims, such as was entertained and sanctioned in the case of *The United States* v. *The Great Falls Manufacturing Co.*, 112 U. S. 645. And it may be, that, even if the exclusive right of the patentee were contested, such an action might be brought in that court, involving all questions relating to the validity of the patent; but, as we have concluded to dispose of the present appeal upon other grounds, it becomes unnecessary to decide the question arising upon this defence. It is referred to only for the purpose of excluding any infer-

ence that might be drawn from our passing it over without notice.

The course of business in the collection of the revenue upon distilled spirits, so far as the use of these stamps is involved, is explained by Mr. Chapman, a witness for the defendant below, who had been chief of the stamp division in the Internal Revenue Office. He says:

"After spirits have been produced they are drawn from the cistern into the barrels, and there is attached to each barrel a stamp, called a warehouse stamp, together with certain marks and brands put on simultaneously with the stamp; this stamp is an oblong piece of paper, properly engraved, with blanks, in which are inserted the numbers of the package, the number of wine and proof gallons contained therein, name of the distiller, location of the distillery, and are signed by the storekeeper and gauger on duty at the distillery; this stamp is merely used as a check, and does not represent a tax; the stamp consists of but one piece of paper about three by two inches, and is attached by paste or other adhesive material, and by tacks at the corner and centre, by the gauger on duty at the distillery; this stamp (warehouse) has been in use from 1868 to the present time, and no change has been made in the construction of the same, the only changes being in the quality and kind of paper used and the designs of the engraving.

"The package is then removed to the bonded warehouse of the distillery, where it remains until the distiller files with the collector of the district a paper, called an entry for withdrawal; this paper is accompanied by the amount of the tax upon the spirits contained in the package; the collector thereupon fills out, signs, and forwards to the gauger the tax-paid stamp, which is a piece of paper nearly square, upon the face of which is engraved the body of the stamp, together with nine coupons, of which stamp and coupons, with the stub that remains in the books from which the stamp is cut, complainant's Exhibit Hollister Revenue Stamp is a copy.

"From 1868 until about 1871 this stamp, which has always been called the tax-paid stamp, was constructed of two pieces of paper; before the stamp was printed, the paper of which the

body of the stamp was composed was perforated with a round aperture, about one and a half inches in diameter; to the back of the paper was then attached, by paste or mucilage, a piece of tissue paper, completely covering said aperture; the stamp was then printed, the engraving covering both the body of the paper and so much of the tissue paper as appears through the aperture. From about 1871 to 1875 the stamp was composed of but one piece of paper, the use of the tissue paper and the aperture having been abandoned. In August, 1871, there was added to the tax-paid stamp a piece of paper, which was pasted by its edges upon the back thereof, as shown in complainant's Exhibit, Hollister Revenue Stamp. Stamps of the latter character have been in use from August, 1875, to this date.

" On receipt of the tax-paid stamps by the gauger, he proceeds to affix them to the head of the barrel, together with certain marks and brands; he, together with the storekeeper, having first signed the same at the places indicated in complainant's Exhibit, Hollister Revenue Stamp. The gauger puts this stamp on the barrel by means of some adhesive material and tacks; he then cancels it by the use of a stencil-plate, imprinting across the face of the stamp and extending over each side upon the head of the barrel waved lines; he also imprints upon the head with a stencil-plate his name and official designation. The whole surface of the stamp is then varnished with a transparent varnish; no varnish can be used which is oily enough to affect the paste.

" The package is then removed from the warehouse and passes into the custody of the distiller or owner. If the owner desires to purify the contents of the package it is then taken to the establishment of a duly authorized rectifier of distilled spirits. The rectifier then notifies the collector of the district that he desires to dump, for rectification, the contents of certain specified packages, whereupon the collector directs a gauger to proceed to the rectifying establishment and gauge the specified packages. When the packages are gauged the gauger is required by regulations to cut from the tax-paid stamp a designated portion thereof, and transmit the same to the collector with a report of his operations. The packages are then dumped

into the tubs of the rectifier, and the identity of their contents lost. . . .

" The portion of the tax-paid stamp detached or cut and forwarded by the gauger, as heretofore described, includes the serial number of the stamp, the date on which the tax was paid, and the number of proof gallons ; the number of the cask, the location of the warehouse, and the person or firm to whom delivered, and the signature of the collector; the part so cut out is over the paper back."

The employment of the paper backing in the stamp used by the appellant, whereby the part to be cut out is prevented from adhering to the head of the barrel, and the arrangement of a part of the stamp so as to identify the package with that described in the stub, the removal of which destroys the stamp so that it cannot be used again, constitutes the alleged infringement of the first claim of the Locke patent, which covers every stamp within that description.

The counsel for the appellee describes " the Locke stamp as a combination of three parts : 1st, a part which is designed to become a stub when the stamp proper is separated therefrom, and displays a serial number; 2d, a constituent part of the stamp proper which is designed for permanent attachment to the barrel ; 3d, a constituent part of the stamp proper displaying the same identifying serial number as the stub, which part, after the stamp proper has been affixed to the barrel, bears such relation to the permanent part, that it can be so removed therefrom as to retain its own integrity, but mutilates and thereby cancels the stamp by its removal."

In this combination it will not be questioned that the first and second elements were well known, and that the third, so far as its contents are identical with those on the stub, is not new. The question turns on that feature of the third element whereby a removable part of the stamp proper, the contents of which identify the stamp with the stub after the stamp has been attached, can be so removed as to retain its own integrity, but mutilates and thereby cancels the stamp by its removal.

This is what we ascertain to be the precise idea embodied in

the invention described and claimed in the patent, and which, although we find to be new in the sense that it had not been anticipated by any previous invention, of which it could therefore be declared to be an infringement, yet is not such an improvement as is entitled to be regarded in the sense of the patent laws as an invention.

In reaching this conclusion we have allowed its due weight to the presumption in favor of the validity of the patent arising from the action of the Patent Office in granting it; and we have not been unmindful of the fact, abundantly proven, and indeed not denied, that the adoption of the present tax-paid stamp, in lieu of that previously in use by the Internal Revenue Bureau, has proven its superior utility in the prevention of frauds upon the revenue. The testimony on that point of the Commissioner of Internal Revenue from his official reports is quite conclusive. In his report for 1875 he mentions the adoption of "new regulations in regard to the use of tax-paid stamps, by which a portion of the stamp is cut out at the time of dumping and returned with the gauger's report," and says: "This effectually destroys the stamp and prevents its re-use, while at the same time, a sufficient amount of the engraving is shown upon the slip to determine whether the stamp is genuine;" and, in 1876, that official reported that "the plan of requiring the return of a portion of the tax-paid stamps, whenever a package to which it is attached is dumped for rectification, has been found to be such a valuable prevention of fraud that it has been extended to include all stamps for rectified spirits and wholesale liquor dealers' stamps.

"These three varieties of stamps for distilled spirits are now prepared at a trifling additional cost, with a paper back affixed to each in such a way that the portion of the stamp containing all the important data can be cut therefrom and filed with the commissioner or collector, thus furnishing conclusive evidence of the destruction of the stamp (rendering its re-use impossible), and furnishing also evidence as to the contents of the package bearing the stamp.

"It is believed that this system affords the government a very effectual protection against the perpetration of fraud

in connection with the collection of the tax on distilled spirits."

Such an increased utility, beyond what had been attained by devices previously in use, in cases of doubt, is usually regarded as determining the question of invention. But in the present case we are not able to give it such effect.

No change, it will be observed, was made in the character of the stamp, so far as the relation between the stamp proper and the stub is concerned, nor in the identifying marks which constituted the written and printed matter upon both ; and the expedient of using a paper backing which prevented the adhesion to the package of the part intended to be detached and removed, it is manifest would be adopted by any skilled person having that end in view.

The idea of detaching that portion of the stamp, with the double effect of destroying the stamp by mutilation and preserving the evidence of the identity of the package on which it had been first placed in use, which is all that remains to constitute the invention, seems to us not to spring from that intuitive faculty of the mind put forth in the search for new results, or new methods, creating what had not before existed, or bringing to light what lay hidden from vision; but, on the other hand, to be the suggestion of that common experience, which arose spontaneously and by a necessity of human reasoning, in the minds of those who had become acquainted with the circumstances with which they had to deal. Cutting out a portion of the stamp, as a means of defacing and mutilating it, so as to prevent a second use, was matter of common knowledge and practice, before the date of this patent; and cutting out a particular portion, on which the identifying marks had been previously written or printed, was simply cutting a stub from the stamp, instead of cutting the stamp from the stub, as before. So that, when the frequency and magnitude of the frauds upon the revenue, committed by the removal of tax-paid stamps from packages, on which they had been originally placed by the officer, to others surreptitiously substituted for them, or by emptying the packages of their original contents, and fraudulently refilling them with spirits on which no tax

had been paid, attracted the general attention of the revenue department, the answer to the problem of prevention was found by immediate inference from the existing regulations, in the adoption of the expedient now in question. As soon as the mischief became apparent, and the remedy was seriously and systematically studied by those competent to deal with the subject, the present regulation was promptly suggested and adopted, just as a skilled mechanic, witnessing the performance of a machine, inadequate, by reason of some defect, to accomplish the object for which it had been designed, by the application of his common knowledge and experience, perceives the reason of the failure, and supplies what is obviously wanting. It is but the display of the expected skill of the calling, and involves only the exercise of the ordinary faculties of reasoning upon the materials supplied by a special knowledge, and the facility of manipulation which results from its habitual and intelligent practice; and is in no sense the creative work of that inventive faculty which it is the purpose of the Constitution and the patent laws to encourage and reward.

On this ground

*The decree of the Circuit Court is reversed, and the cause remanded, with directions to enter a decree dismissing the bill.*