HARTFORD WOVEN-WIRE MATTRESS CO. *v.* PEERLESS WIRE MATTRESS CO.

*Circuit Court, D. Connecticut.* April 14, 1885.)

1. PATENTS FOR INVENTIONS—WIRE MATTRESSES—FARNHAM PATENT—REISSUE No. 7,704—NOVELTY.
    Reissued patent No. 7,704, granted to the Hartford Woven-wire Mattress Company, as assignee of John M. Farnham, for an improvement in bedstead frames, on May 29, 1877, *held* not void for want of novelty, and infringed by defendants.

2. SAME—PERKINS PATENT No. 109,446.
    Patent No. 109,446, granted George C. Perkins for an improvement in woven-wire fabrics for mattresses, dated November 30, 1869, *held* void for want of invention.

In Equity.
*Charles E. Perkins*, for plaintiff.
*Wm. Edgar Simonds*, for defendant.

SHIPMAN, J.   This is a bill in equity to restrain the alleged infringement of reissued letters patent No. 7,704, granted May 29, 1877, to the plaintiff, as assignee of John M. Farnham, for an improvement in bedstead frames, and also of letters patent No. 109,446, granted November 22, 1870, to George C. Perkins for an improvement in woven-wire fabrics for mattresses. The original Farnham patent was dated November 30, 1869. The description of the Farnham invention, as given in the original and reissued specifications, is contained in the opinion of this court in *Woven-wire Mattress Co.* v. *Wire-web Bed Co.* 8 FED. REP. 87.

The four claims of the reissue are as follows:

"(1) The combination of the side-bars and end-bars, and elastic coiled wire fabric, D, attached only to the end-bars, with the end-bars of the frame elevated above the side-bars, so that the fabric will be suspended above the side-bars from end to end of the frame. (2) The combination in a removable bed-

bottom, or bedstead frame, of the side-bars, A, standards or corner pieces, B, end-bars, C, and the elastic fabric, D, combined and arranged substantially as and for the purpose specified. (3) The inclined double end-bar, C, of the bedstead frame, arranged substantially as and for the purpose herein shown and described. (4) The standards, B, constructed as described, arranged longitudinally adjustable on the side-bars of a bedstead frame, to permit the inclined end-bars to be set a suitable distance apart, as set forth."

The third and fourth claims are substantially identical with the two claims of the original patent.

The object of the invention was to provide a frame by means of which the elastic, woven-wire fabric, which is the subject of letters patent to Franz Rudolph Wegman, dated March 6, 1866, could be conveniently and securely held. The invention consisted in clamping the two ends, only, of the fabric between double inclined end-bars, so that the entire strain of the weight upon the bed-bottom being lengthwise rather than crosswise, and in the direction of the greatest elasticity of the fabric, will also come upon the edge only of the end-bars; and further consisted in connecting the side-bars and end-bars by longitudinally adjustable standards, or corner pieces, which would permit the inclosed end-bars to be adjusted so as to stretch the fabric, if desired.

The object of the first claim of the reissue was to enlarge the patent so that inclined end-bars need not be indispensable, but that the invention should be made to consist, so far as these bars are concerned, in end-bars elevated above the side-bars. The elevation necessarily results from the method in which the frame is constructed, but the feature of the invention which was a novelty, and which gave to the first claim of the original patent its value, was the inclined end-bars. So also the words "attached only to the end-bars," are an undue enlargement of the original patent, if the invention is permitted to depend upon that feature. At the same time that feature is a part of the structure which indispensably belongs to it, and which the drawings exhibited, and when the claim is limited, as it must be, to double inclined end-bars, there is no expansion of the original patent. It is a matter of common knowledge that the fabric was always attached only to the end-bars, in the sense that it was supported entirely by those bars. The curtain or fringe, which sometimes hung from the end-rails to the side-rails as an ornament or finish, never was attached to the side-bars so as to have any "pull" upon them.

The intent of the second claim of the original patent was to eliminate the inclination of the end-bars and the longitudinal adjustment of the standards from the description of the invention; but the claim must be construed to require both those features, or their manifest equivalents, known to be such at the date of the invention. While protesting against this construction of the first and second claims, the learned counsel for the defendant admits that it leaves to them life and validity.

The novelty of the first and third claims was considered and sus-

tained in the *Wire-web Bed Case,* 8 FED. REP. 87, and by Judge BLOD-GETT in *Whittlesey* v. *Ames,* 13 FED. REP. 895. The infringement of those claims can hardly be doubted, after the testimony of the president of the defendant corporation, who admits that his company sold frames with inclined end-rails, though he denies that they were intentionally made so as to infringe. The standards of the second and fourth claims are thus described in the specification of the reissue:

"To the ends of each side-bar are secured, by means of bolts, *a, a,* upward projecting standards, B, B, made of metal or other suitable material. These bolts pass through short longitudinal slots in the standards, whereby the latter may be adjusted to stretch the cloth when desired. These standards are grooved or have ribs on their inner sides by which the ends of the end-bars, C, C, are held. The end-bars connect the side-bars and their standards with each other. * * * The end-bars are held in inclined positions, as shown in Fig. 1, by the ribs or grooves in the standards, and are held in place by means of screws, *c,* which are fitted through the standards, or by other equivalent devices."

These standards are upwardly projecting iron chairs, to which the end-bars are fastened and in which they rest, and which are secured to the side-bars by bolts passing through slots, and thus the side-bars are longitudinally adjustable so that the end-bars may be moved to tighten the fabric. It is plain, the elastic bed-bottom being suspended entirely from the end-bars, that a great strain will come upon them, and that each bar must be firmly secured to each of its neighbors. This necessity calls for a standard or support which shall bind the bars together, so that the strain shall not move them, and yet it must be capable of adjustment, so that the fabric may be tightened or loosened, if need be.

The novelty of the standard is attacked by letters patent No. 26,-575, granted to A. M. Dye, December 27, 1859. The object of his invention was "to obtain a facile mode of straining or tightening the webbing of the [bed] bottom," and consisted in attaching the end-bars to the side-bars by means of dovetailed projections upon the bottom of the end-bars, which slide in dovetailed slots cut in the tops of the side-bars, and by a screw-bolt which passes through a hole in the dovetailed projection and beyond it into the slot, and is held firm by a nut which presses against the projection. This is a method of fastening the side-bars and end-bars together, and of longitudinal adjustment of the side-bars for the purpose of tightening the webbing, but is a very different thing from the longitudinally adjustable standard of Farnham, which rigidly binds end-bars and side-bars together. The Dye arrangement has no standard. On the contrary, the end-bar slides in a slot in the side-bar. The two systems are upon a different principle.

The defendant uses the Farnham standard without a slot in the standard, but it is made longitudinally adjustable on the side-rail in the following way: A slot is made in the rail into which a projection on the inside of the standard enters; a screw bolt runs longitudinally

through this projection and holds the side-bar firmly in its place, and is capable also of adjusting the side-bars relatively to the end-bars.

In the plaintiff's device the slots are in the standard, and the bolts pass laterally through the slots. In the defendant's device the slot is in the rail, and the bolt passes longitudinally through the slot. In each case the standard is longitudinally adjustable on the side-rails for the purpose of permitting the end-bars to be set at a suitable distance apart.

The change in the location of the slot makes it necessary that the screw which holds the rail and the standard together should move longitudinally instead of laterally. Thus far there is no change in function; there is merely a mechanical change in the form and arrangement of the parts. In the defendant's device the screw is of itself available in stretching the fabric, whereas in the plaintiff's device the fabric must be stretched by some force extrinsic to the standard, and the screws hold it after it is stretched. The defendant has thus obtained an effect additional to the one theretofore produced, but, having taken the Farnham standard and all its beneficial results, the infringement is not mitigated because another result has been superadded.

The Perkins patent was for an improvement upon the Wegman patent of March 6, 1865. The Wegman invention consisted "in constructing a mattress of spiral wire springs, linked or braided together and stretched upon a frame. * * * The springs are made of steel or other wire, wound into a spiral form by proper machinery, and linked together so that each convolution of the spring passes through two or more of the adjoining springs." The patentee also said that the spiral wire springs will ordinarily be arranged double, that is, consisting of two series of springs interwoven together, but that a greater number of spirals can be linked together to give greater strength and stiffness to the web. The Perkins invention is said in the specifications of the patent to consist "in forming cords of several spiral metallic springs in parallel coils wound together in the manner hereinafter described, and also in weaving them into a woven-wire fabric of any of the usual forms made of coiled wire for the purpose of stiffening such portions as may be necessary. Condensing somewhat the language of the specifications, "the spiral wheels from the cords are woven or coiled together, so that the convolutions of one wire lie close to and parallel to the next. The cords can be formed by introducing the end of each coil separately at one end of the cord and turning it through to the other end." In mattresses these cords are placed near the edge, and are also placed at distances apart through the fabric so as to give it the desired stiffness.

From the quotation which has been given from the Wegner patent, from the history of the improvement as detailed by the witnesses, and from inspection of the article itself, it appears that the improvement was not an invention, but was a matter of ready mechanical adjust-

ment. The recent decisions of the supreme court are emphatic in demanding for a patentable invention more than the novelty and utility which may be expected to result from the special knowledge and intelligent skill of the mechanic in the branch to which the invention belongs. *Hollister* v. *Benedict Manuf'g Co.* 113 U. S. 59; S. C. 5 Sup. Ct. Rep. 717; *Thompson* v. *Boisselier*, 5 Sup. Ct. Rep. 1042.

Let there be a decree for an injunction and an accounting with respect to the Farnham patent, and for a dismissal of so much of the bill as relates to the Perkins patent. The costs pertaining to each issue are to be taxed in favor of the successful party, but the excess only of one over the other is to be paid.