TIFFANY v. PAPER PRODUCTS CO., Inc.

SAME v. NOBLE MFG. CO.

(District Court, N. D. Georgia.    July 27, 1917.)

Nos. 30, 36.

PATENTS ⬤⟳328—VALIDITY—WINDING CONE.
    The Gess patent, No. 986,379, for a winding cone, is void for lack of patentable invention and anticipation, the alleged improvement shown by inturning the apex end of the cone and smoothing and rounding the same to prevent the cutting or breaking of the yarn or thread being something which would naturally occur to any skilled mechanic familiar with the art, and which had previously been used and described in prior patents.

In Equity. Suit by Henry L. Tiffany against the Paper Products Company, Incorporated, and by same complainant against the Noble Manufacturing Company. On final hearing. Decrees for defendant.

Emery, Booth, Janney & Varney, of Boston, Mass., and Irwin & Tison, of Cedartown, Ga., for plaintiff.

John M. Coit, of Washington, D. C., and Bunn & Trawick, of Cedartown, Ga., for defendant.

NEWMAN, District Judge. This is a suit brought by the plaintiff against the defendant for infringement of letters patent No. 986,-379 of the United States granted to one Charles Gess on March 7, 1911, upon application filed January 3, 1911, which was duly assigned by said patentee to the plaintiff by an instrument in writing, dated December 29, 1910, and recorded in the Patent Office of the United States on February 8, 1911.

The invention claimed, and for which letters patent No. 986,379 were issued, covers an improvement in cone-tubes adapted to receive or to have wound thereon yarn, thread, or the like, of the commonly known cone winding form, and from which the yarn, etc., is drawn off axially or substantially so. Such cone tubes are customarily formed of paper rolled in one or more layers or coils in conical form, and are adapted to be mounted for winding upon tapering arbors of the general shape of the tubes. Owing to the marked taper of the conical tubes, and the liability to slipping or displacement of the yarn or thread wound thereon, and particularly of the first laid layers, said cone tubes are superficially roughened throughout their entire length. In the process of unwinding the yarn or thread from such tubes, it was found that the tip of the cone tube so constructed offered obstruction thereto, causing the yarn to pull, thus changing the tension, or even breaking the same.

The patent in questions covers such a device, having a roughened exterior, as described, but with the roughening ridges removed from the top portion of the tube, so that they will offer no obstruction to the yarn or thread as the latter and especially the first laid layers are being unwound from the tube, and also the tip end of said cone being inturned and smooth and softer and more yielding than the body of the tube, the material of said tip end being circumferentially displaced; the apex portion to extend beyond the arbor or winding member.

The plaintiff claims that the rights and privileges granted by said letters patent are of great value, that he and his assigns and predecessor in interest have invested and expended large sums of money, and have been to great trouble and expense in and about said invention and improvements and in carrying on the business of manufacturing and selling cone tubes containing said invention and making same profitable to themselves and useful to the public, and that a very large number of same have been sold with great profit to plaintiff and advantage to the public.

Plaintiff then alleges that but for the wrongful acts and doings of the defendant and others acting in concert with it he would now be in undisturbed possession and enjoyment of said invention and improvements and would now be making large gains, profits, and advantages from the manufacture, use, and sale of said invention, but that he has been prevented and hindered from making said gains, profits, and advantages by the wrongful acts and doings of the defendant and others acting in concert with it.

Plaintiff further alleged that the defendant, well knowing the premises and the rights and privileges secured to the plaintiff, did, after the grant of said letters patent, and before the commencement of this suit, at the city of Cedartown, Ga., and elsewhere in the United States, without the license or allowance and against the will of the defendant, and in infringement of said letters patent, make or cause to be made, and sell or cause to be sold, cone tubes containing the invention and improvements described in said letters patent, and that said defendant intends and threatens to continue to make and sell more of such cone tubes, all in defiance of the rights acquired by and secured to

the plaintiff, by which plaintiff has sustained, and will sustain, great and irreparable loss and injury.

It is further alleged that the defendant has made and realized, and is still making and realizing, large gains, profits, and advantages from the manufacture, use, and sale of cone tubes embodying the said invention and improvement.

The plaintiff then prays for an injunction, and for an accounting, and costs.

Defendant admits that letters patent of the United States for an alleged improvement in cone tubes were issued on March 7, 1911, to Henry L. Tiffany, as alleged assignee of Charles Gess, but denies, on information and belief, that the said Charles Gess was the true, original, and first inventor of Cone tubes as alleged. Defendant further denied that Charles Gess, was, before the 3d day of January, 1911, the true, original, and first inventor of any new and useful improvement in cone tubes, and described in the patent in suit which had not been known or used by others in this country or patented or described in any printed publication in this or any foreign country before his alleged invention or discovery thereof, or which was not for more than two years prior to the filing by him of an application for letters patent therefor in public use or on sale in this country, or which had not been abandoned by him prior to the filing of any such application.

Defendant denies that any rights and privileges granted and secured by the patent in suit are of great value to the plaintiff, but, on the contrary, alleges that the said patent covers no invention or improvement whatever, denies, on information and belief, that the public generally has acknowledged or acquiesced in the claimed rights of the plaintiff and his alleged assignor, and denies that it has been guilty of any wrongful acts or doings, or that any acts on its part have tended to prevent the undisturbed possession and enjoyment by the plaintiff of any rights, gains, profits, or advantages to which he was entitled under the law, and denies that any acts on its part have hindered plaintiff from making any gains, profits, or advantages to which he was entitled under the law. Defendant then denies that the complainant is entitled to the exclusive use of the alleged invention and improvements.

Defendant further denies that it well knew the alleged premises and any rights and privileges secured to the plaintiff, and denies that it did anything to injure plaintiff and deprive him of any benefits and advantages secured to him by said letters patent, and denies that it did, after the grant of said letters patent and before the commencement of this suit, at Cedartown, Ga., or elsewhere in the United States, in infringement of said letters patent, make or cause to be made, and sell or cause to be sold, cone tubes containing the alleged inventions and improvements described in said letters patent and recited in the claims thereof. It denies, further, that it intends or threatens to make and sell cone tubes in infringement of said letters patent, and further denies that plaintiff has sustained or will sustain any loss or injury, or that the complainant has been deprived of any

gains or profits which it otherwise would have obtained by any wrong-ful act on the part of the defendant.

Defendant then avers, on information and belief, that said letters patent No. 986,379 is and always has been invalid and void and of no force and effect, because: (1) In view of the state of the art there is nothing described, shown, or claimed in said patent involving any invention or discovery whatever; (2) that prior to his supposed invention or discovery the thing alleged to be patented by said patent and all material and substantial parts thereof had been patented, shown, and described in certain letters patent set out, and in the applications therefor; (3) that prior to any supposed invention or discovery by said Charles Gess the thing alleged to be patented by said letters patent and all material and substantial parts thereof had, within the United States, been used by and known to each of certain persons whose names and addresses are then set out, and to many others not known or specifically named.

Much testimony has been offered by both parties, some of it by depositions and some by witnesses in open court, and by exhibits.

The question is whether or not the patent which is sought to be set up in this proceeding, or rather the precise thing set up by the plaintiff as the thing which he invented and discovered, is a patentable invention, or whether what he did is a thing which persons with mechanical knowledge and familiar with the trade in which these tubes are used would have brought about such an improvement or change by the exercise of mere mechanical knowledge or the knowledge of one familiar with this particular art or trade. Or, stated more sim-ply, perhaps, the question is whether or not the inturning of the small end of these cone tubes, to prevent them from catching the thread passing over them, is a matter of invention.

It will be understood that there is no claim here for a process patent; that is, for the machine by which this inturning was done or for the manner in which it was done. The claims are for the thing itself, for the discovery of the inturned end tube, or round-nosed tube, as distinguished from the square-nosed tube without the inturned edges.

Much of the discussion here has been given to this question. In order to hold that this inturned cone tube was a patentable device, it must appear that the exercise of the inventive faculty was neces-sary to its production. The claims made by the patentee in his ap-plication for patent are as follows:

"1. As an article of manufacture, a winding cone having a roughened yarn retaining surface markedly conical in shape to permit the yarn to free itself from said roughened surface when drawn from the end of said cone, the latter having an inturned yielding apex end.

"2. As an article of manufacture, a markedly conical winding cone, hard and self-sustaining to receive support from an internal rotating driver or ar-bor, said cone having an inturned, yielding apex end, to extend beyond said interior driver or arbor.

"3. As an article of manufacture, a markedly conical winding cone having stiff, cone supporting side walls adapted to seat upon a rotating driver, said cone having an inturned apex end to extend beyond said driver.

"4. As an article of manufacture, a markedly conical winding cone having cone supporting conical walls adapted to seat upon a rotating driver and also

having an inturned end to extend beyond said driver and indifferently centered internally with respect to the axis of said cone.

"5. As a new article of manufacture, a winding cone having a rough yarn retaining surface markedly conical in shape to permit the yarn to free itself from said roughened surface when drawn from the end thereof, said cone having its smaller end inturned and the roughened conical surface coincidently blending into a smooth inturned end surface.

"6. As an article of manufacture, a markedly conical winding cone having conical supporting walls adapted for continuous seating contact with and upon a driving member or arbor, thereby to adapt said cone for sustaining a large and heavy mass of yarn, said cone having a conical apex portion to extend beyond said member or arbor and with its end inturned to prevent deflective obstruction of the yarn traverse arising from conformation of said supporting walls to said driver.

"7. As an article of manufacture, a markedly conical winding cone hard and self-sustaining to receive support from an internal rotating driver or arbor, the tip of said cone being inturned and smooth and softer and more yielding than the body of the tube, the material of said tip end being circumferentially displaced."

As I understand it, claims 3, 4, 5, and 6 are the ones especially insisted upon here.

In determining whether this inturning of the apex end of the cone tube is 'a patentable invention, let us look at the law governing this matter. In 30 Cyc. 828, on the subject of patentability, this is said:

"The subject-matter of patents must not only come within the statutory classes, but must be new and useful. It must further be of such a character as to have called for an exercise of the inventive or creative faculties of the mind, as distinguished from the mere exercise of the knowledge and judgment expected of those skilled in the particular art."

In Muller v. Ellison (C. C.) 27 Fed. 456, Judge Shipman, in a brief opinion disposing of a patent case with reference to chains for bracelets, says this:

"The improved method of manufacture commences after the spirals have been wound and interwoven together in the customary way. The first step is to clip the ends of the spirals evenly, by one transverse cut, by a pair of shears. Then the end of each spiral is cut by a pair of cutting pliers, to bring the ends in the right shape for bending in. All the ends of the spirals are then bent. The edge is finished by pressing or flattening. The entire invention consists in bending inward the ends of the spiral. In this there is no inventive genius. The idea of bending in, rather than of soldering, the ends, or of closing the ends of the spirals, was an idea which would naturally suggest itself to the worker in wire, and did not partake of invention, and the steps by which the bending was accomplished were the ordinary work of the skilled artisan (citing Pearce v. Mulford, 102 U. S. 112 [26 L. Ed. 93]; Hollister v. Benedict Manuf'g Co., 113 U. S. 59 [5 Sup. Ct. 717, 28 L. Ed. 901])."

Of course the thing claimed to be an invention there is somewhat different from here, but it is in line, I think, with what is contended for here. It is a mere turning in of the ends of the spiral there, and it is the mere turning in of the ends of the cone tubes here.

In Pearce v. Mulford, 102 U. S 112, 26 L. Ed. 93, cited by Judge Shipman, the first headnote is as follows:

"To entitle an improvement to protection under the patent laws, it must be the product of the exercise of the inventive faculties, and involve something beyond what is obvious to persons skilled in the art to which it relates."

In Hollister v. Benedict Manufacturing Co., 113 U. S. 59, 5 Sup. Ct. 717, 28 L. Ed. 901, the first two headnotes are as follows:

"Novelty and increased utility in an improvement upon previous devices do not necessarily make it an invention. A device which displays only the expected skill of the maker's calling, and involves only the exercise of ordinary faculties of reasoning upon materials supplied by special knowledge and facility of manipulation resulting from habitual intelligent practice, is in no sense a creative work of inventive faculty, such as the Constitution and the patent laws aim to encourage and reward."

In Thompson v. Boisselier, 114 U. S. 1, pages 11, 12, 5 Sup. Ct. 1042, 1048 [29 L. Ed. 76], in the opinion by Mr. Justice Blatchford, the rule being discussed here is stated in this way:

"To refer only to some more recent cases, adjudged since these suits were decided below, this principle was applied in Vinton v. Hamilton, 104 U. S. 485 [26 L. Ed. 807], where, a cupola-furnace being old, and a cinder-notch being old, and the use of a cinder-notch to draw off cinders from a blast-furnace being old, and the cinder-notch, in drawing off the cinder from a cupola-furnace, performing the same function as in the blast-furnace, it was held that the application of the cinder-notch to the cupola-furnace would occur to any practical man, and that there was nothing patentable in such application.

"In Hall v. Macneale, 107 U. S. 90 [2 Sup. Ct. 73, 27 L. Ed. 367], a cored conical bolt, in a safe, with a screw-thread on it, having existed before, and also a solid conical bolt, it was held to be no invention to add the screw-thread to the solid conical bolt.

"In Atlantic Works v. Brady, 107 U. S. 192, 200 [2 Sup. Ct. 225, 27 L. Ed. 438], it was said that it is not the object of the patent laws to grant a monopoly for every trifling device which would naturally and spontaneously occur to any skilled mechanic or operator, in the ordinary progress of manufactures; and this doctrine was applied in Slawson v. Grand Street Railroad Co., 107 U. S. 649 [2 Sup. Ct. 663, 27 L. Ed. 576]; in King v. Gallun, 109 U. S. 99 [3 Sup. Ct. 85, 27 L. Ed. 870]; in Double-Pointed Tack Co. v. Two Rivers Manufacturing Co., 109 U. S. 117 [3 Sup. Ct. 105, 27 L. Ed. 877]; in Estey v. Burdett, 109 U. S. 633 [3 Sup. Ct. 531, 27 L. Ed. 1058]; in Bussey v. Excelsior Manufacturing Company, 110 U. S. 131 [4 Sup. Ct. 38, 28 L. Ed. 95]; in Pennsylvania Railroad Co. v. Locomotive Truck Co., 110 U. S. 490 [4 Sup. Ct. 220, 28 L. Ed. 222]; in Phillips v. Detroit, 111 U. S. 604 [4 Sup. Ct. 580, 28 L. Ed. 532]; in Morris v. McMillin, 112 U. S. 244 [5 Sup. Ct. 218, 28 L. Ed. 702]; and in Hollister v. Benedict Manufacturing Co., 113 U. S. 59 [5 Sup. Ct. 717, 28 L. Ed. 901].

"In the case last cited the thing claimed was new, in the sense that it had not been anticipated by any previous invention, and it was shown to have superior utility, yet it was held not to be such an improvement as was entitled to be regarded, in the patent law, as an invention."

Even assuming then, that this round-nosed cone had not been anticipated in the prior art, if it is a thing which "would naturally and spontaneously occur to any skilled mechanic or operator in the ordinary progress of manufactures," it is not a patentable invention.

The distinction between mere mechanical knowledge or the knowledge of one familiar with the particular art or trade, on the one hand, and the exercise of the creative faculty or the faculty of invention, on the other hand, is at times quite difficult. There may be some difficulty about it here, but it seems to me that the mere inturning of the edges of the square-nosed cone which had been in use for many years, and turning it in so that the ragged edges of the square-nosed cone would not be there to intercept the movement of the yarn or thread, is a thing which would occur readily to any one skilled in the art or even reasonably familiar with the business of spinning yarn

and adapting the same to be used readily in knitting mills. It is not right to the public to class it as having been such an invention or discovery as is patentable.

These same cone tubes with the rounded or inturned apex end were used by others before the Gess patent was applied for. Witness for the plaintiff, A. J. McCausland, who was the son of Wm. J. McCausland, whose patent will be referred to hereafter, testified in reference to the business of his father as follows:

"Q. Did he have on hand at any time any machinery for rounding over or turning in the ends of cone tubes? A. There is now on the second floor of our factory a machine, formerly a cone cutter, which has been used for rounding the ends of cone tubes. Q. When was that machine first used for rounding or turning in the ends of cone tubes? A. Why, I should say in August, 1909. Q. Was it necessary to make any change in the machine to adapt it to turn in ends of the cone tubes? A. Yes. It was necessary to make a socket, heated by gas, to fit over the end of the cone tube which rotating in the socket turned in the ends. Q. Who built that machine and who made the change in it to which you have just referred? A. It was built by John Eppler, of Philadelphia, upon drawings submitted by my father. When the machine was delivered to us it would not work properly, and our machinist, Mr. John Kaiser, made the necessary changes and alterations in same and completed it. John Kaiser, at my father's orders, made a socket and placed same on the cone cutter for turning in or rounding the ends. Q. Is that socket still in the machine as it stands up on the second floor? A. The original socket is not in the machine. These sockets have been so worn at various times that it was necessary to remove same from the machine and replace with another socket. During the time that this machine has been used for inturning ends of cones, there have probably been six or seven different sockets in the machine; of the number of sockets used I am not positive. As soon as one socket would become so worn as to be unfit to do the work properly, another socket was made and placed in the machine. There is, however, a socket on the machine at the present time. Q. Does the W. J. McCausland estate use that machine now for inturning the ends of cone tubes? A. Yes, when we have any orders for them. Q. It has been used for inturning the ends of cone tubes whenever the W. J. McCausland estate had orders for them ever since it was first adapted for that work, has it not? A. Yes. Q. Does the machine mentioned by you, in which Kaiser placed the socket, turn in and round over the tip ends of cone tubes in substantially the same way as is illustrated in these cone tubes to which I call your attention, Exhibit No. 6 in the present case? A. Yes; but not as much. The reason for that is that my father had the socket made for use in his business of the resale of secondhand cone tubes. He had a socket to round over the ends of spoiled or mashed cones. We used the one socket to fit all cones. We did not have separate sockets to fit each different taper of cone tube. Q. I assume that, even where the cone tubes varied in size, or taper, the tip ends of all of them were near enough the same size to permit you to use the single socket to turn them all in, is that right? A. Yes. Q. This machine, when it was first used, to turn in the ends of cone tubes, as you have testified, turned them in in substantially the same way that you have testified that it now turns them in, did it not? A. It turned them in, but not as much as shown in the samples. Q. It did, however, in the beginning, and when first used round over, or turn in, and smooth off, the tip of the cones did it not? A. Yes. * * * Q. The turning in of the ends of the cone tubes, as it was first done, on this machine, made the tip end of the cone tube less liable to break the thread in unwinding than those same cone tubes would have been if the ends had not been turned in, did it not? A. Yes. Q. To what extent did your father inturn the tip ends of defective, secondhand cone tubes in 1909 and 1910, I am referring to the number? A. Probably about on the average 20,000 a month. * * * Q. You have testified that some time in 1909 or 1910 your father treated the ends of cone tubes by presenting them to a socket; what shape did this operation give to the end of the cone? A. Rounded, beveled, or turned in the ends of the cone. Q. To make the record clear, was the result more of

a turning in or was it more of a mere bevel? A. It was not turned in as much as the samples, because for reasons already given I have stated that we did not have a separate socket for each different kind of cone. On the Broadbent cone it is necessary to have the end open large enough for a pin to extend through. There are no polished point or rounded cones made to my knowledge for Broadbent winders. Q. You have stated that customers had not ordered round-nosed tubes when your father first beveled the ends thereof: that is in 1909 or 1910. Please state whether or not customers did specify these beveled tubes after that time. A. They ordered them later on, when they came in general use."

It seems perfectly clear from this evidence that McCausland made practically and substantially the same thing for which Gess is now claiming a patent, and that he did this as early as 1909. He was, as will be understood from the testimony, taking secondhand square-nosed cones and inturning and rounding the tips.

The reply of the plaintiff to the foregoing testimony, or his counsel's contention with reference thereto, seems to me to be wholly insufficient in view of the positive statement of the witness A. J. McCausland that his father was making secondhand tubes with inturned, rounded ends, which, from his description, were substantially like those here made. The effort to distinguish it as having a hole for the mandrel to pass through in the tip of the rounded end seems to me to be without merit as against this showing of a former use of the same contrivance.

In addition to the foregoing, there have been introduced in evidence patent No. 171,577, issued to J. McCausland, December 28, 1875, and patent No. 227,281, issued to Wm. J. McCausland, May 4, 1880. These patents are both for what are called paper cop-tubes. In the first patent, No. 171,577, in his specifications, the patentee says:

"The objects of my improvements are to render paper cop-tubes as serviceable in wool-spinning as in cotton, to afford a positive frictional contact with the spindle at the tip of the tube, and to prevent the tip from readily becoming burred or ragged."

He also says:

"My invention partially consists in a paper cop-tube tapered to correspond with its spindle, and provided with a solid flanged base. Another feature of my invention consists in a tapered paper cop-tube with an interior contracted tip, whereby a firm frictional contact is attained with the spindle at the tip of the tube, and said tip prevented from readily becoming ragged or burred."

His claims on this patent are:

"1. A tapered paper cop-tube, provided with a solid flanged base built up from or attached to the tube, substantially as described.

"2. A tapered paper cop-tube, having an internally-contracted tip, substantially as described."

In the patent to Wm. J. McCausland, the patentee says:

"I am aware that a paper cop-tube has been contracted at the tip, whereby a firm frictional contact of the top of the tube with the spindle is assured; but this was effected without such solidifying and compressing of the paper as to result in the hard polished end, which is the characteristic of my improved cop-tube."

His claim is for "a paper cop-tube condensed, hardened, polished, and rounded at one or both ends, as set forth." He also states this about his invention:

"These tubes are made by rolling and pasting strips of paper, the upper and lower ends of the tubes being left in a ragged condition, which is objectionable, especially on the upper end of the tube, as the sharp and thin projecting edges of the paper frequently cut the threads and otherwise interfere with the proper spinning of the same."

The patentee had been speaking of the ordinary paper cop-tube which had this defect, among others, of cutting the threads and otherwise interfering with the proper spinning of the same. What he claimed to do was to condense, harden, and polish the end so as to prevent this difficulty. His brother had previously, as I have stated, in his patent No. 171,577, claimed a paper cop-tube having an internally contracted tip. What the latter patentee sought to do, as I understand it, was to condense, harden, and polish what had been previously claimed in the first patent by his brother.

It may be stated in addition that W. J. McCausland, in his specifications, after stating the objections that existed to the usual cop-tubes, which I have mentioned above, says:

"In order to overcome this defect, I push the upper end of an ordinary cop-tube against a rotating die, of the shape shown in Fig. 7, this die having a circular recess, from which projects a central pin, a, into the tube. The effect of this rapidly revolving die on the tube is to condense the paper and reduce the ragged edge to the smooth rounded termination shown in Fig. 5, the rounded surface being hard and uniform, so that it cannot have any injurious effect on the thread in spinning. The die has also the effect of compressing the end of the tube inward to the extent determined by the central projection, a, which is of such a diameter that the tube will fit on the end of the spindle in the manner shown in Fig. 5."

There are differences, of course, but what I wish to say is that W. J. McCausland, in making his round-nosed, inturned cone tubes, which he did in 1909, obtained the idea from his own and his brother's specifications as shown in their patents with reference to these paper cop-tubes. Both inturned the tip end of the cop-tubes, and W. J. McCausland "hardened, condensed, and polished" the inturned end.

This shows, I think, that the idea of inturning and smoothing the tip ends of supports for yarn to be drawn off for spinning purposes was in existence and in considerable use before Gess' application for patent was filed. W. J. McCausland's effort, both in his patent and in his remodeling of secondhand cone tubes, in 1909, was to so construct the thread support that the thread could be drawn off without catching or breaking. It seems to me too clear for argument that he had the same idea which Gess eventually put into his patent for rounded end cone tubes.

A number of patents and many devices have been put in evidence here to illustrate the prior state of the art, which show, in different ways, that the idea that Gess claims he evolved was in existence and put into use many years before the patent in question here was applied for. And it is perfectly manifest from these that, even if Gess did have an idea or mental conception in reference to inturning and rounding the ends of these cone tubes, the same idea had long been entertained by others; that is the same idea of smoothing and rounding the ends of cone tubes or cop-tubes so as to prevent the thread from catching and breaking.

Among these suggestions are the frequently used button, or ball, or acorn, as it was called, an article made of wood, and sometimes of iron or other material, smooth and rounded, to be placed in the end of the square-nosed cone tubes and extending far enough above the tip to prevent the yarn from catching on any rough or ragged edges there might be on the apex of the cone tube. A device similar to this is shown in patent to Stone, No. 534,768, dated February 26, 1895. Another suggestion, which is very old in the art, is the so-called "Bottle Bobbin," a device used for the support of thread for spinning under certain conditions, and also the cop-tubes with inturned, rounded ends, such as are covered by the McCausland patents above discussed, all of which were introduced in evidence.

In addition to the above are the suggestion in the patent to Gillespie, No. 269,662, dated December 26, 1882, which was an invention to "produce paper tubes with a cylindrical bore and a tapered end without the cutting, shearing, or removal of any of the material," and the English patent No. 4360, to Keene, dated March 23, 1887, for an improvement in spools or bobbins, the object of which was to overcome certain disadvantages mentioned by—

"producing an enameled spool or bobbin having the yarn retaining portion thereof slightly roughened or 'dull' finished, by means of which the yarn is prevented from slipping off faster than is required, the end portion, or tip of said spool at the same time having a smooth finished surface, so that the yarn will not catch thereon in unwinding from the spool."

There is another interesting and peculiar feature of this case which should have brief mention at least. In the testimony of Lewis T. Shurtleff, who was a clerk and had been with the Pairpont Corporation of New Bedford, Mass., for 24 years, is the following:

"Q. 21. Were the knitall or round-nosed cones manufactured and sold by the Pairpont Corporation in 1909? A. They were. Q. 26. Please state when the round-nosed cone was first brought to your attention and by whom, stating the circumstances in detail? A. To my best knowledge and belief, it was in April, 1909, that Mr. Henry L. Tiffany applied to us to make the knitall cone. It was a new and different operation, and necessary for us to prepare machinery and to experiment to quite an extent to perfectly round the points, in a satisfactory way. After considerable experiment in regard to the method, we obtained satisfactory results, and made our first shipment to the Kilburn Mills of New Bedford on July 24, 1909, and we billed to them on that date one case of 1,204 of the knitall cones, and the second case of shipment on July 30, 1909, 1,560, as shown by exhibit, which are leaves or pages from the Pairpont Corporation sales book. Q. 31. You say in answer to Q. 26 that he applied to you in April, 1909, to make the knitall cone. Please describe that cone, particularly with reference to the tip thereof? A. There were objections to the old style square point or tip cone, because the yarn in rendering would draw across the sharp edge and cut or break the yarn and cause damage, not only to the knitted garment, but often to the machines. Mr. Tiffany discovered that a round-pointed smooth-finished cone that was closed at the top would be a great improvement, and applied to us to fit special machinery to smoothly polish the point, leaving no wrinkles or seams, completely closing them at the top, and we fitted for doing this work and named them the knitall cones. Q. 35. Were the cones which were shipped as testified by you in answer to question 26, on July 24, 1909 and July 30, 1909, cones having a rounded substantially closed end, like that of the patent in suit, 986,379? A. They were. Q. 36. Please compare the cones which were shipped as testified by you in answer to question 26, on July 24, 1909, and July 30, 1909, as to the tips thereof with the il-

lustration in the drawing of the patent in suit No. 986,379? A. They are the same.   Q. 34. State whether or not the Pairpont Corporation readily undertook the manufacture of these cones? A. We did not consider it as a matter of importance sufficient to specially fit machinery and prepare for doing the work.   We did not consider it worth bothering with, as it required considerable time and expense, but Mr. Tiffany insisted that we proceed with it at his expense, and after considerable experimenting and trying, we submitted samples which were approved by Mr. Tiffany."

Later in his testimony Mr. Shurtleff testified:

"Q. 85. I call your attention to your answer to question 81, reading as follows: 'Mr. Tiffany discovered that a round-pointed, smooth-finished cone that was closed at the tip end would be a great improvement,' and ask you in what sense you used the word 'discovered.' A. He, Mr. Tiffany, first brought it to our attention, though I understand that the discovery was made by a Mr. Gess."

It is contended by the defendant that this shows prior use of the very improvement claimed by the patentee here as early as 1909, when the patent was not applied for until January, 1911.  On the other hand, the contention for the plaintiff is that the inference properly to be drawn from all the testimony is that Mr. Tiffany, although he became the assignee of the patentee, Gess, at the time the patent was applied for in 1911, knew of Gess' discovery when he had the cones made by the Pairpont Corporation in 1909.  On the other hand, the defendant contends that there is nothing whatever in the record from which any such inference can be drawn, but, on the contrary, it shows that Tiffany himself had discovered this improvement, if it be a discovery, and had himself carried out the idea of having the cones inturned and smoothed at the tips.  I attach no great importance to this one way or the other, but I simply state what the record shows, and that is what has been mentioned above, that Tiffany went to Shurtleff, an employé of the Pairpont Corporation, to have these cones made in April, 1909, and said nothing then, so far as the record shows, that left any impression that he was using or putting into effect a discovery made by Gess.

I have omitted to state in what has been said that the "winding cone having a roughened yarn retaining surface markedly conical in shape to permit the yarn to free itself from said roughened surface when drawn from the end thereof," as it is expressed in the claim of the patent, is not claimed to be covered by this patent, and there is no issue and no contention in the case about this.  This roughened surface is simply a device for holding the thread or yarn on the cone and keeping it from slipping, and such cones have been long in use.  The only point in question and to be considered here is the rounded or inturned tip.

After fully considering this matter and all of the evidence in the case, and the very able briefs of counsel on both sides, my conclusions are:

First. That this inturning of the apex end of the cone tube, and smoothing and rounding the same, does not involve invention, and that therefore it was not patentable.

Second. That even if it would be a patentable invention if new, it had been long anticipated in the art in various patents which have been

referred to above, and more particularly by W. J. McCausland's cop-tube patent and his subsequent manufacture of the round-nosed cone tubes, his discovery of the inturned cop-tube, as I have stated, entering into his knowledge which enabled him to have the round-nosed cone tubes made in 1909.

The bill, I think, for the reasons given, is without merit, and must be dismissed.

There is a case of Henry L. Tiffany v. Noble Manufacturing Company (No. 36, in Equity), which, as a result of what has been decided above, is without merit, and should also be dismissed.