### HARVEY HUBBELL, Inc., v. FITZGERALD MFG. CO.

(District Court, D. Connecticut. September 13, 1922.)

No. 1559.

Patents ⊚⇒328—1,064,833, for separable attachment plug for making electrical connections, void for lack of invention.

The Hubbell patent, No. 1,064,833, for separable attachment plug for electrical connections, *held* void for lack of invention; also not infringed.

In Equity. Suit by Harvey Hubbell, Inc., against the Fitzgerald Manufacturing Company. Decree for defendant.

See, also, Harvey Hubbell, Inc., v. General Electric Co. (D. C.) 262 Fed. 155.

Clifton V. Edwards and Laurence K. Sager, both of New York City, for plaintiff.

Charles L. Sturtevant, of Washington, D. C., for defendant.

THOMAS, District Judge. This is the usual patent suit, charging the defendant with infringement of letters patent No. 1,064,833, granted to Harvey Hubbell on June 17, 1913. The subject-matter relates to what is known as separable attachment plugs for use in making electri-

⊚⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

cal connections. One part of the plug screws into the wall socket, floor socket, lamp socket, or the like, and the other part is readily separable therefrom by the strain necessary to pull apart the pairs of spring contacts respectively carried by the base part of the plug and the cap part; the latter carrying the ends of the electrical cord or conductor. The ownership of the patent by the plaintiff is admitted. The issues are validity and infringement.

The claims in suit are 5 to 10, inclusive. Claim 5 is for the "plug base," the "bracket carrying contacts," etc., the "center screw engaging one bracket," the "screw shell having an overlying flange engaging the other bracket," etc. Claim 6 further specifies that the base shall be "provided with an annular ledge," that one of the brackets shall have "a shoulder resting on said ledge," and that the screw shell shall be provided with "a flange engaging said shoulder." Claim 7 further limits, over claim 6, by providing that the flange of the screw shell which engages the shoulder of the contact shall be "overlying said ledge" and that the center screw shall engage the "angular portion of the other bracket." Claim 8 specifies that the screw shell shall have "an overlying flange between which and the ledge the other bracket is gripped. Claims 9 and 10 are specific to the "annular ledge," the bracket support "resting upon the ledge," and the screw shell flange engaging the contact shoulder.

The defendant denies infringement on the ground that the claims sued on are so restricted in scope that they are not infringed by defendant's structure, and further alleges that the improvement or invention claimed is invalid because of the prior art. The invention has for its objects, as stated in the specifications, "to simplify and to generally improve the construction and operation of separable attachment plugs" and consists, to quote from the specification, "in certain novel constructions and combinations of parts."

In the patent in suit the plug comprises a base having recesses or chambers for the contacts and a supporting annular ledge on the upper or socket end. There is a contact, with contact bracket, and a screw shell, the latter having an overlying flange, the contact bracket and overlying screw shell flange meeting and contacting, and are supported at the annular ledge. There is a contact bracket, which rests upon a ledge upon the base, which is engaged and held in place by the overlying flange of the screw shell. There is an insulating body portion, cylindrical in shape, surrounded by a screw shell of metal. Through the body of the insulating material there are two longitudinal recesses, which extend parallel to the axis of the plug, and in these two parallel recesses are contained the contacts, and through these contact recesses blades on the cap enter and provide the immediate connection with the contact springs inside. The two contacts are carried at their upper ends by brackets, the bent-over parts of which are called "shoulders." One rests on the ledge, and the other on the central elevation. The contacts are seated on their bases on the socket end of the plug. The central one is secured by means of a screw, and the flange on the screw shell base secures the other contact. The contact on the ledge upon which the screw shell rests is secured by a drop of solder, which connects the screw shell with

one of the brackets and holds it securely. The base contacts are made in the form of spring clips, and each is formed by two double spring fingers secured to the bracket.

The base part of the defendant's plug has two single spring finger contacts, one extending out and connected with another contact in defendant's structure, which is bent around the end of the wall on one side of the plug eyelet, which is molded into the base and riveted on the bent end of the spring finger. The other contact is bent around the end of the wall on one side of the plug, and extends down into a recess on the side of the plug, where it is engaged by the screw shell. These single base spring fingers are connected directly with the screw shell and a center connection, which is by means of a rivet. The contact springs are single springs, and the contact with the screw shell is made by the two legs of the spring straddling the insulation body of the base. The screw shell flange overlies the portion which connects the two legs, and has contact throughout the length of the outside leg. The central contact is secured to the base by a rivet molded into the composition of the base.

On March 26, 1912, and prior to the grant of the patent in suit, the plaintiff secured a patent on "improvement in separable attachment plugs," No. 1,021,101. This patent was issued about 15 months prior to the patent in suit, although the applications for both patents were pending concurrently. In patent No. 1,021,101 there were set forth elements not unlike the claims and ultimate allowances of the patent in suit; the base in the earlier patent having a screw shell, contacts in the base, brackets by which the contacts were carried, one of the brackets being retained in place by the screw shell, and the second bracket, serving as a center contact with a socket, being retained in place by a screw and an insulating guard disk, almost identical with the claims in the patent in suit. In the earlier patent the plaintiff claimed many features which were rejected by the Examiner.

Many of the claims in the second patent were claimed and rejected in the first patent, and in principle the patents are very similar. The earlier patent contained an insulating guard disk intermediate the cap and the base, which does not appear in the second patent, and it also had a cylindrical contact post. The only apparent differences between the earlier patent and the one in suit are that the prior patent has a cap, with an insulating disk between the cap and the base, and the contact posts in the cap in the one are tubular, and in the other they are flat.

The rule upon this situation is clearly stated by the Circuit Court of Appeals in Harvey Hubbell, Inc., v. General Electric Co., 267 Fed. 564. Judge Hough said, on page 570:

"The rule that acquiescence in the rejection of a broad claim, when accompanied by the acceptance of a narrower one, estops the patentee from ever demanding for the claim he got an interpretation that would cover what he was not given (Corbin, etc., Co. v. Eagle, etc., Co., 150 U. S. 38, 14 Sup. Ct. 28, 37 L. Ed. 989) has we think never been departed from in this court."

Hence the plaintiff is estopped from claiming for the claims of the patent in suit an interpretation to which they are not justly entitled. The course which the patent in suit followed through the Patent Office, and the claims rejected and the allowances made, indicate persuasively

and conclusively that the plug which Hubbell sought to patent contained little to entitle it to a patent, and it was only after broad allowances were made and claims withdrawn to a great extent that a patent subsequently issued, and there appears to be little in it to entitle it to be construed as a valid patent.

In order that the claims of the patent be held valid, there must be invention, novelty, and utility. It is not enough that the device shall be new, in the sense that the shape or the form in which it is produced shall not have been known before, and that it shall be useful, but it must, under the law, amount to invention. In Hollister v. Benedict Manufacturing Co., 113 U. S. 59, 5 Sup. Ct. 717, 28 L. Ed. 901, Mr. Justice Matthews used some language which establishes an affirmative rule, as nearly as one can be established, by which to determine the presence or absence of invention in every case. Speaking of a simple device, which the court held was not invention, he said (113 U. S. at page 72, 5 Sup. Ct. 724, 28 L. Ed. 901) it —

"seems to us not to spring from that intuitive faculty of the mind put forth in the search for new results, or new methods, creating what had not before existed, or bringing to light what lay hidden from vision, but, on the other hand, to be the suggestion of that common experience, which arose spontaneously and by a necessity of human reasoning, in the minds of those who had become acquainted with the circumstances with which they had to deal."

In holding a patent to be void, the Supreme Court, speaking by Mr. Justice Bradley, in Atlantic Works v. Brady, 107 U. S. 199, 2 Sup. Ct. 231 (27 L. Ed. 438), exponded the rule in the following manner:

"The process of development in manufactures creates a constant demand for new appliances, which the skill of ordinary head workmen and engineers is generally adequate to devise, and which, indeed, are the natural and proper outgrowth of such development. Each step forward prepares the way for the next, and each is usually taken by spontaneous trials and attempts in a hundred different places. To grant to a single party a monopoly of every slight advance made, except where the exercise of invention, somewhat above ordinary mechanical or engineering skill, is distinctly shown, is unjust in principle and injurious in its consequences. The design of the patent laws is to reward those who make some substantial discovery or invention, which adds to our knowledge and makes a step in advance in the useful arts. Such inventors are worthy of all favor. It was never the object of those laws to grant a monopoly for every trifling device, every shadow of a shade of an idea, which would naturally and spontaneously occur to any skilled mechanic or operator in the ordinary progress of manufactures. Such an indiscriminate creation of exclusive privileges tends rather to obstruct than to stimulate invention. It creates a class of speculative schemers who make it their business to watch the advancing wave of improvement, and gather its foam in the form of patented monopolies, which enable them to lay a heavy tax upon the industry of the country, without contributing anything to the real advancement of the arts. It embarrasses the honest pursuit of business with fears and apprehensions of concealed liens and unknown liabilities to lawsuits and vexatious accountings for profits made in good faith."

Each and every element of the patent upon which the claims were predicated is old in the art. The contact in the recesses, the central screw contact, the screw shell contact, even the feature of the short plug—the brackets carrying contacts, have all been used before, and in many different patents many of the features individually have appeared, making it apparent that no patent can be held valid upon these

elements at this late day. The plug which the plaintiff has produced is a useful one, no doubt, and the combination as assembled makes it possible to produce it economically and at reduced cost over the old and larger plugs. It also finds a large market available; but this is undoubtedly true, among other things, because of the constantly increasing demand for electrical devices for the many uses now made of electrical appliances in households everywhere. The view expressed by Judge Dickinson in Johnson v. Lit Bros. (D. C.) 278 Fed. 279, as to commercial success being an evidence of invention, is particularly relevant, as much is made by the plaintiff of the commercial success of the plug of the patent in suit. On page 280, he said:

"Commercial success is often spoken of as a test (at least in doubtful cases) of invention. It is strongly urged in this case. At the most it can never be more than merely evidence of the presence of invention. None, as before often observed, can ever be sure how much success is due to the arts of the salesman and how much to the inventive merits of what is sold. More than this, mere commercial success is never a test of invention, nor even evidence of its presence. The thing that counts is recognition by those who deal commercially in what is patented of the claim of the patentee to exclusive ownership. This has evidential value, precisely as what is asked and what offered in commercial dealings is evidence of commercial value."

None of the elements which go to make up the Hubbell plug in the patent in suit rise to the dignity of invention which the law recognizes. The screw shell contact is not new or an inventive idea, but is almost as old as the art itself and has appeared in many patents. In the Tregoning patent, No. 861,238, the contacts were made both in the screw shell and in the central screw. In the Dallam patent, No. 964,619, appears:

"A shell contact mounted upon and surrounding the lower end of the base."

In the Hubbell patent, No. 774,250:

"The base consists, especially, of a shell, 37, and a 'button,' so called, of porcelain or other insulating material, 38. The button is ordinarily secured to the shell by crimping the metal of the shell about it."

In the Hubbell patent, No. 923,179:

"The insulating block is provided near its lower end with a shoulder 30, which supports a cylindrical insulating lining indicated by 31, and over the outer edge of which the lower end of the screw shell is turned. Contact spring 34 is secured to the screw shell by a rivet 36, which also secures the screw shell to insulating disk 36."

In the Platt patents, Nos. 953,708 and 953,709, one of the contacts is held in place solely by the screw shell. Nothing novel or inventive with respect to the screw shell contact is apparent. The use of the screw shells for holding contacts in place appear also in numerous other patents, including Tournier, No. 815,764.

Nor is the plaintiff's claim of the short plug of such a nature as to entitle it to restricted rights. Short plugs have appeared in the two Platt patents, and in the Hubbell patent, No. 923,179, the placing of the base contacts within the recesses or spaces circumscribed by the screw shell on the base, making the short plug possible. These are not new features, and cannot be claimed as such. This is a mere matter of design, and does not entitle the owner to the monopoly of a patent. The

patent laws rest solely upon the policy of the law to promote the progress of science and of the useful arts, and so far nothing which appears in the plaintiff's plug arises to that which would entitle him to anything more than commercial success and adaptability for use. The contact with the central screw appears in the Hubbell patent, No. 774,-250. The patentee there says:

"I also preferably provide a central recess 33 to receive a connecting screw."

It also appears in the Tregoning patent, No. 861,238, as well as in Dallam, No. 964,619.

This leaves the question of the use of the screw shell to hold down the particular brackets with their contacts. The Hubbell patent, No. 774,-250, with "brackets to which the locking contact springs are secured," shows spring clip contact fastened to brackets or bases independent of the contact; one bracket being attached to or connected with a central screw contact, and the other bracket being connected with the enlarged or flanged end of the screw shell.

There are substantial points of difference between the defendant's plug and the plug of the patent in suit. The first difference is that the base part of the defendant's plug has two single spring contacts, these being a single piece of metal bent to shape, while the plug in suit has double spring arms between which the contact plate is inserted. One of the contacts of the defendant's plug is by means of the straddling piece of metal forming contact with the screw shell containing no brackets, and differs, both with respect to the brackets and with respect to the manner of supporting the contact, from the plaintiff's plug, and has a contact throughout the length of the outside leg. The central contact of the plaintiff's plug is by means of a screw running the entire length of the base of the plug, whereas the defendant's plug is by means of a rivet to hold the contact in place and running but a very short distance into the base.

The plaintiff lays much stress upon the fact that the brackets rest upon a ledge of insulation, but this feature is absent from the defendant's plug. The brackets of the plaintiff's plug 21 are of entirely different construction from the straddling one-piece bent-over construction of the defendant's plug. The single bent-over piece of metal of the defendant's plug, running down the outside of the porcelain or composition rubber base and being incased by the screw shell, differs substantially and materially from the device of the patent in suit, and necessarily, therefore, constitutes no infringement by the defendant.

There appears very little difference between the Hubbell patent, No. 1,021,101, and the patent in suit. The earlier patent contained all of the elements of the latter patent in the manner of contact, location of the contacts, the bracket features, the recesses, and the insulation. It contained the screw shell, and the contact by the center screw; also the ledge feature and the flange holding the contact in place with the customary drop of solder which appears in both bases. The elements are arranged in substantially the same way and produce the same results, with the exception that the earlier patent has an insulation disk between the cap and the base. There is a further difference in the shape of the contact blades and in the shape of the recesses into which these

blades fit, but the blades used in the later patent are not such as are in any way new in the art.

It seems clear that the contentions of the defendant are sound. To hold the patent in suit valid would be to give to the plaintiff an additional monopoly by virtue of the fact that all of the substantial features contained in the patent in suit are contained in the earlier patent, No. 1,021,-101, and would result in an extended monopoly for a period longer than the law contemplates. But, if the claims be held valid, I conclude that there is no infringement, for the reasons given.

The bill is accordingly dismissed, with costs to abide the event; and it is so ordered.

Decree accordingly.

⚙➞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes