## HOOKLESS FASTENER CO. v. GREENBERG et al.

### No. 883-Y.

District Court, S. D. California, Central Division.

Feb. 6, 1937.

O'Melveny, Tuller & Myers, By Walter K. Tuller and John Hurlbut, and Lyon & Lyon, By Frederick S. Lyon, all of Los Angeles, Cal., for plaintiff.

Gold, Silk & Quittner, By A. S. Gold, of Los Angeles, Cal., and Mock & Blum, By Asher Blum, of New York City, for defendants.

YANKWICH, District Judge.

This suit relates to Sundback patent 1,557,381, issued on October 13, 1925, on a hookless fastener, now owned by the plaintiff as assignee of the inventor. The patent was an improvement on Sundback patent 1,243,458, issued on October 16, 1917. See Lion Fastener v. Hookless Fastener Co. (C.C.A.3, 1934) 72 F.(2d) 985.

The article covered by these patents is a fastener consisting of interlocking metallic members, disposed along the edges of stringers on opposite sides of a slit, and which are made to join by means of a slide through which they pass. The slide engages the projections and the recesses of the members and fastens the two sides of the slit. The interlocking is achieved by means of the fitting of the projections on the metallic members into corresponding recesses. The fastener has come to be known in popular language as "the zipper," presumably because of the hissing sound which the slider makes when it is moved quickly across the stringer.

When the first article—to which we shall refer as "the original zipper"—made its appearance, it was successful only in a limited way because—as one witness testified—it would not take washing, dry cleaning, or pressing. This for the reason that the fastener opened from behind the slider, there was mismeshing, jamming of the flanges—all traceable to the fact that the projections and recesses fitted closely. The limited commercial use of the original zipper as contrasted with the widespread use of the improved articles is illustrated in the following table giving the number of fasteners sold, the net sales and the number of persons employed, from the date of the first invention to 1936.

| Year | Fasteners Sold | Net Sales | Employees |
|---|---|---|---|
| 1917 | 24,072 | $ 9,319.08 | 17 |
| 1918 | 90,056 | 28,469.27 | 22 |
| 1919 | 66,779 | 16,161.40 | 20 |
| 1920 | 110,500 | 26,469.95 | 27 |
| 1921 | 342,152 | 81,244.10 | 42 |
| 1922 | 759,187 | 188,229.54 | 99 |
| 1923 | 2,026,572 | 407,513.66 | 216 |
| 1924 | 4,081,282 | 835,520.94 | 277 |
| 1925 | 5,189,837 | 1,185,466.60 | 350 |
| 1926 | 8,517,167 | 1,855,751.64 | |
| 1927 | 11,944,899 | 2,517,085.46 | 566 |
| 1928 | 8,240,906 | 1,561,369.20 | 361 |
| 1929 | 17,004,306 | 2,945,257.85 | 602 |
| 1930 | 20,041,122 | 3,408,039.30 | 663 |
| 1931 | 23,994,985 | 4,153,555.63 | 851 |
| 1932 | 18,510,604 | 3,492,125.84 | 848 |
| 1933 | 26,426,377 | 5,429,172.16 | 1,215 |
| 1934 | 50,189,316 | 8,543,013.90 | 2,605 |
| 1935 | 81,511,883 | 11,721,935.80 | 4,260 |

Thus it will be seen that while the original invention was moderately successful, the improved invention put the concern manufacturing it in the "big business" class.

The practical difficulties, which confined its practical use to small surfaces and made it unsatisfactory when applied to large surfaces, and particularly to surfaces requiring flexibility in the zipper, called for an improvement which would achieve increased flexibility. Sundback achieved it by what might be termed an abandonment of good mechanical technic. The original zipper contemplated a snug or close fitting between the interlocking members. This is good mechanical technic. In the prior art we find it followed. In the original British patent, Kuhn-Moos, the projection is nail-like and the recess is a rounded hole. When the members are brought together they fit as a nail or a wooden peg would fit tightly into the hole. This snug fitting appeared also in Sundback patent 1,243,458, although the shape of the projection there was that of a truncated pyramid. This gave the stringer, on which the members were fastened, a stiffness which prevented use on large surfaces, caused the members to jam when so applied, and limited the scope of the invention to small articles such as coin purses, tobacco pouches, and the like. The great field of garments and particularly of washable goods was closed to the invention chiefly because of lack of this flexibility. So Sundback, by going contrary to ordinary mechanical technic, made an improvement in the patent, which is covered by the letters patent in suit, and which consisted chiefly in substituting a loose fitting between the projection and the recess for the snug fitting of the original invention.

This was done by providing a clearance between the projection and recess, achieved, not be respacing of the members on the stringers, but by so constructing the members that when the zipper is closed, the clearance is there.

In the specifications, Sundback describes the improvement thus: "According to this invention, a clearance is provided between the projection of one interlocking member and the walls of the recess in its cooperating member so located relatively to the stringers and the heads and recesses as to adapt this fastener for use with washable articles such as overalls, children's cloth-

ing, etc., where difficulty has been encountered due to shrinkage of the tape stringers, or the fabric to which attached. This clearance results from a different contour of the sockets and projections shown in said patent and enables quite wide variations in stringer length and member spacing to exist without causing the members to jam or to become so loose as not to stay interlocked. Also, where the members tend to jam, excessive wear is caused on the slider, or even distortion sufficient to render a new one necessary. Since the projections and cooperating sockets are not so nearly identical in fit, as in said patent, the dies and punches used in making the members need not be of such high precision, and may be used for a longer time when worn from their original contour because of the greater clearance permitted by this invention, thus cheapening the tool and labor cost of production." We shall refer to this invention as "the improved zipper." The defendant is charged with the infringement of this invention through the sale of zippers imported from Japan. The particular claims, of the infringement of which the plaintiff complains, are claims 1, 3, 4, 5, 6, 8, and 10. They are set out in the margin.[1]

To my mind this improvment shows invention over the prior art, not indicated or anticipated by it, of the type which, from the beginning of patent law, has been held to be patentable. 35 U.S.C.A. § 31; Grant v. Raymond (1832) 6 Pet. 218, 8 L.Ed. 376; Seymour v. Osborne (1870) 11 Wall. 516, 20 L.Ed. 33; Parks v. Booth (1880) 102 U.S. 96, 26 L.Ed. 54; Eibel Process Co. v. Minnesota & Ontario Paper Co. (1923) 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523; In re Edmonds (Cust. & Pat.App. 1935) 77 F.(2d) 765.

The difficulty with improvement patents—a difficulty which is responsible for the fact that many claimed improvements are ultimately declared invalid—is that they are often changes brought about, not by the exercise of the creative or inventive faculties, but by the application of ordinary faculties or mere mechanical skill, and would suggest themselves to any person skilled in the art. When this is the

---

[1] "(1) A plurality of interlocking members for an opening, which are adapted to be controlled by a slider, each of said members being provided with a projection on one side and a recess on the opposite side in axial alinement with said projection, the recess being enough larger than the projection to permit a lateral movement between the interlocked members.

"(3) A plurality of interlocking members for an opening controlled by a slider, each member having a tapered projection on one side and a larger tapered recess on the opposite side, said members being arranged along the opposite edges of said opening to permit shrinkage of the material containing said opening and permit said members to be moved together longitudinally while not interlocked without interfering with the ability of said members to be controlled by the slider.

"(4) A fastening means for the opposite edges of a slit material adapted to be progressively controlled by a slider and comprising a plurality of similar interlocking members, each comprising a tapered projection on one side and an aligned tapered recess on the opposite side for co-operation with the complementary portions of similar members, the projection of each member being smaller than its recess, whereby each projection is adapted to have a clearance on all sides thereof while interlocked.

"(5) The combination with a plurality of similar interlocking members arranged along the opposite sides of an opening and each provided with a tapered recess and projection, of a slider for progressively controlling said members, the adjacent interlocking members being spaced apart longitudinally to permit of lateral flexibility and longitudinal movement without affecting the facility of engagement.

"(6) A plurality of interlocking members adapted to be controlled by a slider, each member being provided with a projection on one side and a recess on the opposite side, the adjacent interlocking members being spaced apart when interlocked and the projections and recesses being tapered and proportioned to insure transverse flexibility of the fastener while interlocked.

"(8) In a fastener, an interlocked member having a transversely elongated recess on one side and an aligned transversely elongated tapered projection on the opposite side smaller than said recess in order to provide lateral clearance.

"(10) The combination with a plurality of interlocking members arranged along the opposite edges of an opening, of a slider adapted to control said members, each member being provided with a transversely elongated and tapered recess and projection, one on one side and the other on the opposite side, said members being spaced apart longitudinally to permit shrinkage and stretching of the material to which they are applied, the spacing between said members being less than half the height of the projection on each member."

case with a claimed improvement, invention is denied to it. Atlantic Works v. Brady (1882) 107 U.S. 192, 2 S.Ct. 225, 27 L.Ed. 438; Hollister v. Benedict Manufacturing Co. (1885) 113 U.S. 59, 5 S.Ct. 717, 28 L.Ed. 901; Aron v. Manhattan Ry. Co. (1889) 132 U.S. 84, 10 S.Ct. 24, 33 L. Ed. 272; Concrete Appliances Co. v. Gomery (1925) 269 U.S. 177, 46 S.Ct. 42, 70 L. Ed. 222; Lektophone Corporation v. Rola Co. (1930) 282 U.S. 168, 51 S.Ct. 93, 75 L. Ed. 274; Powers-Kennedy Contracting Corporation v. Concrete Mixing & Conveying Co. (1930) 282 U.S. 175, 51 S.Ct. 95, 75 L.Ed. 278; Saranac Automatic Machine Corporation v. Wirebounds Patents Co. (1931) 282 U.S. 704, 51 S.Ct. 232, 75 L.Ed. 634; Smith v. Magic City Kennel Club (1931) 282 U.S. 784, 51 S.Ct. 291, 75 L.Ed. 707; American Fruit Growers, Inc., v. Brogdex Co. (1931) 283 U.S. 1, 51 S.Ct. 328, 75 L.Ed. 801; Carbice Corporation v. American Patents Developments Corporation (1931) 283 U. S. 420, 51 S.Ct. 496, 75 L.Ed. 1153; De Forest Radio Co. v. General Electric Co. (1931) 283 U.S. 664, 51 S.Ct. 563, 75 L. Ed. 1339; Permutit Co. v. Graver Corporation (1931) 284 U.S. 52, 52 S.Ct. 53, 76 L.Ed. 163; Electric Cable Joint Co. v. Edison Co. (1934) 292 U.S. 69, 54 S.Ct. 586, 78 L.Ed. 1131; Paramount Publix Corporation v. American Tri-Ergon Corporation (1935) 294 U.S. 464, 55 S.Ct. 449, 79 L.Ed. 997; Stelos Co. v. Hosiery Motor-Mend Corp. (1935) 295 U.S. 237, 55 S.Ct. 746, 79 L.Ed. 1414; Bassick Co. v. Hollingshead Co. (1936) 298 U.S. 415, 56 S. Ct. 787, 80 L.Ed. 1251. As said in Paramount-Publix Corporation v. American Tri-Ergon Corporation, supra, 294 U.S. 464, at page 473, 55 S.Ct. 449, 453, 79 L. Ed. 997: "*To claim the merit of invention, the patented process must itself possess novelty.* The application of an old process to a new and closely analogous subject-matter, *plainly indicated by the prior art* as an appropriate subject of the process, is not invention." (Italics added.)

Again, often the alleged improvement is merely an attempt by the same inventor to recapture his old invention with a slight or unimportant change. This cannot be done. Bassick Co. v. Hollingshead Co. (1936) 298 U.S. 415, at page 425, 56 S. Ct. 787, 791, 80 L.Ed. 1251.

■ But there may be invention in a new combination of old elements which achieve a better result. "Generally speaking, a combination of old elements, in order to be patentable, must produce by their joint action a novel and useful result, or an old result in a more advantageous way." Grinnell Washing Machine Co. v. Johnson Co. (1918) 247 U.S. 426, at page 432, 38 S.Ct. 547, 62 L.Ed. 1196.

■ The test often used is whether a new function has been evolved out of the old elements. Seymour v. Osborne (1870) 11 Wall. 516, 20 L.Ed. 33; Gould v. Rees (1872) 15 Wall. 187, 21 L.Ed. 39; Radio Corporation of America v. Dubilier Condenser Corporation (C.C.A.3, 1932) 59 F. (2d) 309. At times the result may be achieved by means which seem simple afterwards. But even though the improvement be slight, there is invention, unless the means are such as were plainly indicated by the prior art. Paraffine Companies v. McEverlast, Inc. (C.C.A.9, 1936) 84 F.(2d) 335. As said in Webster Loom Co. v. Higgins (1881) 105 U.S. 580, at page 591, 26 L.Ed. 1177: "It is further argued, however, that, supposing the devices to be sufficiently described, they do not show any invention; and that the combination set forth in the fifth claim is a mere aggregation of old devices, already well known; and therefore it is not patentable. This argument would be sound if the combination claimed by Webster *was an obvious one* for attaining the advantages proposed,—one which would occur to any mechanic skilled in the art. But it is plain from the evidence, and from the very fact that it was not sooner adopted and used, *that it did not,* for years, occur in this light to even the most skilful persons. It may have been under their very eyes, they may almost be said to have stumbled over it; but they certainly failed to see it, to estimate its value [to give it shape and form], and to bring it into notice. Who was the first to see it, to understand its value, to give it shape and form, to bring it into notice and urge its adoption, is a question to which we shall shortly give our attention. At this point we are constrained to say that we cannot yield our assent to the argument, that the combination of the different parts or elements for attaining the object in view was so obvious as to merit no title to invention. *Now that it has succeeded, it may seem very plain to any one that he could have done it as well. This is often the case with inventions of the greatest merit.* It may be laid down as a general rule, though perhaps not an invariable one, that *if a new combination and arrangement of known elements produce a new and beneficial result, never attained before, it is evidence of invention.* It was *certainly* a new

and useful result to make a loom produce fifty yards a day when it never before had produced more than forty; and we think that the combination of elements by which this was effected, *even if those elements were separately known before,* was invention sufficient to form the basis of a patent." (Italics added.) And see Bates v. Coe (1878) 98 U.S. 31, 25 L.Ed. 68; Expanded Metal Company·v. Bradford (1909) 214 U.S. 366, 29 S.Ct. 652, 53 L.Ed. 1034.

To avoid infringement, the defendant seeks to limit the claims to members having a projection in the form of a truncated pyramid and a larger recess of the same form, into which they fit without touching, as shown in the drawing accompanying the patent in suit, which is here reproduced.

Fig.1.

■ An inventor is not limited to the form described in the letters patent, unless form is the essence of his invention. There may be infringement even though the form be changed. Courts will look through the form to the substance of the invention which the patent seeks to secure. As said in an old case [Winans v. Denmead (1853) 15 How. 330, at page 343, 14 L.Ed. 717]:

"Where form and substance are inseparable, it is enough to look at the form only. Where they are separable; where the whole substance of the invention may be copied in a different form, it is the duty of courts and juries to look through the form for the substance of the invention— for that which entitled the inventor to his patent, *and which the patent was designed to secure;* where that is found, there is an infringement; and *it is not a defence, that* *it is embodied in a form not described, and in terms claimed by the patentee.*

"Patentees sometimes add to their claims an express declaration, to the effect that the claim extends to the thing patented, however its form or proportions may be varied. But this is unnecessary. The law so interprets the claim without the addition of these words. The exclusive right to the thing patented is not secured, if the public are at liberty to make substantial copies of it, *varying its form or proportions.* And, therefore, the patentee, having described his invention, and shown its principles, and claimed it in that form which most perfectly embodies it, is, in contemplation of law, deemed to claim every form in which his invention may be copied, unless he manifests an intention to disclaim some of those forms." (Italics added.)

A later restatement of the same principle by the Supreme Court in the light of its own holdings over a long period of years is found in Sanitary Refrigerator Co. v. Winters (1929) 280 U.S. 30, at pages 41, 42, 50 S.Ct. 9, 12, 74 L.Ed. 147: "There is a substantial identity, constituting infringement, where a device is a copy of the thing described by the patentee, *'either without variation, or with such variations as are consistent with its being in substance the same thing.'* Burr v. Duryee, 1 Wall. 531, 573, 17 L.Ed. 650. *Except where form is of the essence of the invention, it has little weight in the decision of such an issue;* and, generally speaking, one device is an infringement of another *'if it performs substantially the same function in substantially the same way to obtain the same result. * * ** Authorities concur that the substantial equivalent of a thing, in the sense of the patent law, *is the same as the thing itself;* so that if two devices do *the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in* name, form, or shape.' Union Paper Bag Machine Co. v. Murphy, 97 U.S. 120, 125, 24 L.Ed. 935. And see Elizabeth v. Pavement Co., 97 U.S. 126, 137, 24 L.Ed. 1000. That mere colorable departures from the patented device do not avoid infringement, see McCormick v. Talcott, 20 How. 402, 405, 15 L.Ed. 930. *A close copy which seeks to use the substance of the invention, and, although showing some change in form and position, uses substantially the same devices, performing precisely the same offices with no change in principle, constitutes· an infringement.* Ives v. Ham-

ilton, 92 U.S. 426, 430, 23 L.Ed. 494. And even where, in view of the state of the art, the invention must be restricted to the form shown and described by the patentee and cannot be extended to embrace a new form which is a substantial departure therefrom, it is nevertheless infringed by a device in which there is no substantial departure from the description in the patent, but a mere colorable departure therefrom. Compare Duff v. Sterling Pump Co., 107 U. S. 636, 639, 2 S.Ct. 487, 27 L.Ed. 517." (Italics added.) A study of the specifications as a whole shows an intention to claim *the flexibility obtained through clearance,* whether it be achieved through the projections and recesses shown in the drawings or through projections and recesses of different shape. In the commercial device manufactured by the plaintiff under the patent, the form used is not that of a truncated pyramid, but a rounded form approximating the shape of a sickle. The form not being the essence of the invention, Sundback could choose a different shape to achieve the clearance. And the defendants, *using the same shape,* could not avoid the charge of infringement by claiming the invention to be limited to the form disclosed in the drawing.

In its final analysis, the contention of the defendants is that so long as the clearance is not achieved through members in which the projections of truncated pyramidal form *fit into* recesses of similar form there could be no infringement. This contention is evidenced by the following colloquy occurring at the trial:

"The Court: Is it your contention that the only infringement there can be of the present patent is by the manufacture of the zipper which follows the truncated pyramidal design shown in the drawings accompanying the Letters Patent?

"Mr. Blum (Counsel for the defendants): *Yes.*

"The Court: Then any change in the form of the member, where the members touch, would not be infringement, despite the fact that it achieves that clearance which was allowed in the Letters Patent, and is described as one of the advantages in the introduction to the claims?

"Mr. Blum: *Exactly,* because *it is merely a case* of *spacing apart.* In other words, if you took their exhibit and suppose, for example, you take this exhibit; you move the members closer to each other, when you move the members closer to each other you have the metal parts touching each other to such extent that the material between them can't shrink any more than if, for example, you take these old metal elements; the shape in the patent is not new; they admit that they use the old shape; they say so specifically. If you take the old patent and space the metal elements apart to get clearance. All that they have done, and all they are entitled to, is to make projections smaller than the recesses, because if you look at their patent, if you take one of these elements and follow it out, here is what you have: You have a very small recess over here, a very small projection, rather, and a great, big recess like that. If you look at one of their parts separately, according to their patent the recess is so great that if they were made out of wood and you cut the projection with a jack-knife and threw it into the recess, it would rattle around. That is their patent.

"The Court: You, of course, admit that the doctrine of equivalents applies to them too? That they are entitled to the benefit of that doctrine. In other words, if the patent actually patents the idea of the clearance, the 'sloppiness' of which Mr. Lyons speaks, then they were not bound to achieve that clearance by building the elements in a certain form if they achieved it by building them in a different form, but through the superimposition of one over the other, that they were entitled to the benefit of it, and we have another situation of the patentee himself using a mechanical equivalent.

"Mr. Blum: The only equivalent that they can have is within this range: Here is a projection and you cut that with a jack-knife, and you throw that into the recess. If the projection is loose and rattles around in the recess, it may be possibly within the scope of the patent. The minute that projection is big enough to plug up that recess, or larger than that, it cannot possibly come within the scope of their patent." (Italics added.)

The position is untenable under the principles just discussed.

The disposition of this question makes the disposition of the question of infringement an easy task.

The testimony in the case was lengthy. There is the usual conflict between experts. But it is evident from the whole record and from an examination of the exhibits with the naked eye and through a magnifying glass and microscope, that the zippers

302

manufactured in Japan and imported and sold by the defendants achieve clearance and consequent flexibility in substantially the same manner as the Sundback improved zipper.

There is identity of means, function, or result. Whatever variation there be is only such as comes within the range of the doctrine of equivalents. Gould v. Rees (1872) 15 Wall. 187, 21 L.Ed. 39; Gill v. Wells (1874) 22 Wall. 1, 22 L.Ed. 699; Imhaeuser v. Buerk (1879) 101 U.S. 647, 25 L.Ed. 945; Sanitary Refrigerator Co. v. Winters (1929) 280 U.S. 30, 50 S. Ct. 9, 74 L.Ed. 147; Wine Ry. Appliances Co. v. Baltimore & Ohio R. R. Co. (C.C.A. 4, 1935) 78 F.(2d) 312.

Three exhibits illustrate this graphically. They are Exhibits 8, 9, and 10. Each consists of the photograph of a zipper, a portion of which has been filed down so as to disclose the relation of the projections to the recesses when the zipper is closed. The portion filed down, in enlarged form, was photographed alongside the zipper itself.

They are here attached, marked Figs. 1, 2, and 3,—Fig. 1 being plaintiff's product, Fig. 2 and Fig. 3 the defendants'.

Fig. 2

Fig. 1

Fig. 3

A look at the photograph discloses not only the clearance, but also the identity of the means of securing it. The filed portions, when examined under a microscope, show similar identity as do also other exhibits in which solder had been poured on the members which were then filed down.

It is argued that flexibility might be achieved by ordinary manufacturing tolerance or even by a defective operation of a stamping machine.

To our mind, such fortuitous irregularity would not give the desired uniformity of flexibility, which the regular spacing achieves.

Of course, if the result were achieved by a mere respacing of the elements, there would be no infringement. The claim based on such respacing was rejected in the Patent Office. And the plaintiff is estopped from asserting it now. Morgan Envelope Co. v. Albany Paper Co. (1894) 152 U.S. 425, 14 S.Ct. 627, 38 L.Ed. 500; A. G. Spalding & Bros. v. John Wanamaker (C.C.A.2, 1919) 256 F. 530; I. T. S. Rubber Co. v. Essex Co. (1926) 272 U.S. 429, 47 S.Ct. 136, 71 L.Ed. 335; Hespe v. Corning Glass Works (C.C.A.2, 1931) 45 F.(2d) 562. Nor would spacing achieved through expansion, contraction or shrinkage of the material of which the stringers are made, infringe.

Such a result would be fortuitous, not involving any copying, deliberate or other, on the part of the defendants. Of course, infringement *does not* arise from knowledge, or lack of it. It arises from acts. Amdur on Patent Law and Practice (1935) p. 611; Walker on Patents (6th Edition) (1929) § 433.

In the last analysis, however, these questions are academic.

We are dealing here *not* with a fortuitous approximation of a similar result, but with a deliberate attainment of it by copying the improved invention, with similarity of function achieved through substantially similar means. *This is infringement.* Apposite are the words of the Supreme Court in Bates v. Coe (1878) 98 U.S. 31, at page 42, 25 L.Ed. 68: "In determining about similarities and differences, courts of justice are not governed merely by the names of things; but they look at the machines and their devices in the light of what they do, or what office or function they per-

form, and how they perform it, and find that a thing is *substantially* the same as another, if it performs *substantially* the same function or office in *substantially* the same way to obtain *substantially* the same result; and that devices are substantially different when they perform different duties in a substantially different way, or produce substantially a different result. Cahoon v. Ring [Fed.Cas. No. 2,292], 1 Cliff. [592] 620." (Italics added.) And see Union Paper Bag Machine Co. v. Murphy (1878) 97 U.S. 120, 126, 24 L.Ed. 935; Sanitary Refrigerator Co. v. Winters (1929) 280 U.S. 30, 50 S.Ct. 9, 74 L.Ed. 147; Skinner Bros. Belting Co. v. Oil Well Improvements Co. (C.C.A.10, 1931) 54 F. (2d) 896; National Battery Co. v. Richardson Co. (C.C.A.6, 1933) 63 F.(2d) 289; Dow Chemical Company v. Williams Bros. Well Treating Corporation (C.C.A.10, 1936) 81 F.(2d) 495.

We conclude that the claims are valid and that the defendants' product infringes claims 1, 3, 4, 5, 6, and 10, but not 8.

Interlocutory decree granting injunction and accounting will issue.